[No. S123832. Dec. 21, 2006.]

AGUA CALIENTE BAND OF CAHUILLA INDIANS, Petitioner, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
FAIR POLITICAL PRACTICES COMMISSION, Real Party in Interest.

240

## Counsel

Reed Smith Crosby Heafey, Reed Smith, Bernard P. Simons, James C. Martin, Kathy M. Banke, George P. Schiavelli, Denise M. Howell; Law Offices of Art Bunce, Art Bunce, Kathryn Clenney; Reed & Davidson, Dana W. Reed and Darryl R. Wold for Petitioner.

Roxborough, Pomerance & Nye, Nicholas P. Roxborough and Vincent S. Gannuscio for Blue Lake Rancheria and Mainstay Business Solutions as Amici Curiae on behalf of Petitioner.

Holland & Knight, Jerome L. Levine, Frank R. Lawrence and Zehava Zevit for Robert Anderson, Carole Goldberg, John LaVelle, Nell Jessup Newton, Judith Royster, Joseph Singer and Rennard Strickland as Amici Curiae on behalf of Petitioner.

Carole Goldberg and Jay Shapiro for UCLA Native American Law Students Association as Amicus Curiae on behalf of Petitioner.

Daniel F. Decker; Lang, Richert & Patch, Val W. Saldaña, Laurie L. Quigley and David T. Richards for Santa Rosa Indian Community of the Santa Rosa Rancheria as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

John M. Appelbaum, Steven Benito Russo, Luisa Menchaca, William L. Williams, Jr., C. Scott Tocher, Holly B. Armstrong; Riegels Campos & Kenyon and Charity Kenyon for Real Party in Interest.

Heller Ehrman White & McAuliffe, Heller Ehrman, John C. Ulin, D. Eric Shapland and Gary Ostrick for California Common Cause as Amicus Curiae on behalf of Real Party in Interest.

Bill Lockyer, Attorney General, Manuel M. Mederios, State Solicitor General, Andrea Lyn Hoch, Chief Assistant Attorney General, Louis R. Mauro and Robert L. Mukai, Assistant Attorneys General, Kenneth R. Williams, Robert C. Nash, Sara J. Drake and Marc A. Le Forestier, Deputy Attorneys General, as Amici Curiae on behalf of Real Party in Interest.

## OPINION

**CHIN, J.**—The question we address is whether the Fair Political Practices Commission (FPPC) can file a lawsuit in superior court against the Agua Caliente Band of Cahuilla Indians (the Tribe), a federally recognized Indian tribe,[1] for the Tribe's alleged failure to comply with the reporting requirements for campaign contributions under the Political Reform Act of 1974 (PRA) (Gov. Code, § 81000 et seq.),[2] an initiative measure that regulates numerous aspects of the election process on the state and local level. We conclude that the FPPC may file the lawsuit and affirm the Court of Appeal's judgment denying the Tribe's petition for writ of mandate.

## DISCUSSION

### I. *Factual and Procedural Background*

The facts and procedural discussion are taken largely from the Court of Appeal opinion, supplemented by the record. In 1974, California adopted

---

[1] Labeling an Indian tribe as federally recognized is a function of the executive branch. (*United States v. John* (1978) 437 U.S. 634, 652–653 [57 L.Ed.2d 489, 98 S.Ct. 2541].) Congress, in turn, has mandated that the executive branch publish an official list of all federally recognized tribes in the Federal Register. (25 U.S.C § 479a-1.) Appearance on the list grants the tribes immunities and privileges, including immunity from unconsented suit, by virtue of their relationship with the United States. (67 Fed.Reg. 46,328 (July 12, 2002).)

[2] All statutory references are to the Government Code unless otherwise noted.

the PRA, which charges the FPPC with its enforcement. (§ 81000.) Consistent with the California Constitution, article III, section 3.5, the PRA requires the FPPC to enforce the statute equally against all affected contributors. (§ 81002 et seq.) In chapter 1, the PRA recites findings of greatly increased costs of election campaigns, large contributions from wealthy corporations and individuals, and the inadequacy of existing laws to address objectionable political practices. (§ 81001; see 7 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, § 272, pp. 432–433.) The PRA seeks to prevent corruption of the political process. It requires, among other things, that "[r]eceipts and expenditures in election campaigns . . . be fully and truthfully disclosed in order that the voters may be fully informed and improper practices may be inhibited." (§ 81002, subd. (a); see also *Fair Political Practices Com. v. Suitt* (1979) 90 Cal.App.3d 125, 132 [153 Cal.Rptr. 311].) The PRA also regulates lobbyists and lobbyists' employers, requiring them to report their lobbying activities in order to ensure the lobbyists do not improperly influence public officials. (§§ 81002, 86113, 86116.)

Real party in interest, the FPPC, sued the Tribe, seeking civil penalties and injunctive relief for the Tribe's alleged violations of the PRA's reporting requirements after the Tribe made substantial campaign contributions to California political campaigns. The FPPC's complaint alleged that the Tribe was subject to PRA reporting requirements for its political campaign contributions totaling more than $7.5 million in 1998, $175,250 in the first half of 2001, and $426,000 in the first half of 2002. The complaint also alleged numerous violations of the PRA, including the Tribe's failure to report lobbying interests (§ 86116), late contributions (§ 84203) of more than $1 million, and failure to file required semi-annual campaign statements (§ 84200). One of the unreported contributions alleged to have been made by the Tribe in March 2002 went to a committee supporting Proposition 51, a statewide ballot initiative. Although Proposition 51 failed, it would have authorized $15 million per fiscal year for eight years to fund several projects, including a passenger rail line from Los Angeles to Palm Springs, where the Tribe operates a casino. The complaint sought monetary penalties (§§ 91004, 91005.5) and an injunction ordering the Tribe to file the PRA's required disclosure statements.

The Tribe, specially appearing, filed a motion to quash service of summons for lack of personal jurisdiction. It claimed that, as a federally recognized Indian tribe, it was immune from suit under the doctrine of tribal sovereign immunity. The trial court denied the Tribe's motion to quash in a written ruling. The court believed that to apply tribal sovereign immunity from suit in this case would (1) intrude upon the state's exercise of its reserved power under the federal Constitution's Tenth Amendment to regulate its electoral

and legislative processes and (2) would interfere with the republican form of government guaranteed to the state under article IV, section 4 of the United States Constitution (sometimes referred to as the guarantee clause). Following the trial court's decision, the Tribe petitioned the Court of Appeal to issue a peremptory writ of mandate directing the trial court to vacate its ruling denying its motion to quash service of summons for lack of personal jurisdiction and enter a new order granting the motion.

After the Court of Appeal denied the Tribe's petition for writ of mandate seeking reversal of the trial court's order denying the motion to quash, this court granted the Tribe's petition for review and transferred the matter to the Court of Appeal "with directions to vacate the order denying mandate and to issue an order directing respondent to show cause why the relief sought should not be granted." Following this court's order, the Court of Appeal issued the order to show cause, and the FPPC filed a return to the petition. The Court of Appeal also allowed the Attorney General of California and California Common Cause to file amicus curiae briefs in the FPPC's support. As we discuss, the Court of Appeal denied the Tribe's motion for a writ of mandate. We then granted the Tribe's petition for review on the important tribal sovereign immunity question.

## II.   *Court of Appeal Opinion*

The Court of Appeal agreed with the trial court that the state's efforts to preserve its republican form of government—the very essence of its political process—from corruption implicated both the guarantee clause and its reserved right under the Tenth Amendment. This interest, the court held, outweighed the Tribe's claim to sovereign immunity from suit.

The Tenth Amendment to the United States Constitution provides that, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." The Court of Appeal reasoned that "surely" one of the powers reserved to the states is the "power and duty to maintain a republican form of government," accorded it under the guarantee clause, which provides, in pertinent part, "The United States shall guarantee to every state in this union a republican form of government . . . ." (U.S. Const., art. IV, § 4.) The Court of Appeal continued, noting that this guarantee "necessarily includes the right . . . to protect against corruption of the political process." The Court of Appeal concluded that the PRA served to vindicate the state's constitutional interest.

The court agreed with the FPPC that "resort to a judicial remedy" is necessary to enforce the PRA against the Tribe in order to uphold the state's constitutional right to guarantee a republican form of government free of corruption. The court observed that rules or procedures required to protect constitutional rights may themselves be given "constitutional stature." (See, e.g., *Dickerson v. United States* (2000) 530 U.S. 428 [147 L.Ed.2d 405, 120 S.Ct. 2326] [*Miranda* warnings are required by federal Constitution and cannot be overruled by an act of Congress]; *Mapp v. Ohio* (1961) 367 U.S. 643, 657 [6 L.Ed.2d 1081, 81 S.Ct. 1684] [rule requiring exclusion at trial of unlawfully obtained evidence "an essential part of both the Fourth and Fourteenth Amendments"].) The state's right to preserve its republican form of government would be "ephemeral" without the right to bring suit to enforce the PRA.

### III.  *Tribal Sovereign Immunity*

### A.  *The Parties' Contentions*

The Tribe has recognized that the state has the power to regulate political campaigns or create campaign contribution disclosure rules within its borders. The Tribe asserts, however, that the state has been divested of the power to *sue* a federally recognized Indian tribe because the United States Supreme Court has declared tribal sovereign immunity a matter of federal law. The Tribe contends that although Congress has in limited circumstances authorized classes of suits against Indian tribes, where Congress has not done so, the tribes' historical immunity from suit remains. The Tribe relies on the high court's rulings that recognize a state's ability to tax or regulate tribal activities but reject a state's ability to sue a tribe to collect the taxes or regulate the tribe unless the tribe has waived its immunity or Congress has limited it. (*Kiowa Tribe of Okla. v. Manufacturing Technologies, Inc.* (1998) 523 U.S. 751, 754–755 [140 L.Ed.2d 981, 118 S.Ct. 1700] (*Kiowa Tribe*).)

The FPPC, by contrast, asserts that the doctrine of tribal sovereign immunity is a federal common law doctrine that does not give the Tribe the power to interfere with state sovereign power over state elections. The FPPC contends that the origins and application of the doctrine indicate that we should not extend it to a case involving the state's constitutional authority to regulate its elections or state legislative processes. We review the competing arguments below.

### B.  *Historical Basis of Sovereign Immunity Doctrine*

In 1831, the United States Supreme Court first recognized that native Indian tribes possess sovereignty that is different from foreign countries, and

is subject to the dominion of the United States. In *Cherokee Nation v. Georgia* (1831) 30 U.S. 1 [8 L.Ed. 25], and *Worcester v. Georgia* (1832) 31 U.S. 515 [8 L.Ed. 483] (*Worcester*), the State of Georgia sought to extend its law to the Cherokee Nation. In *Cherokee Nation* the high court described tribes as "domestic dependent nations," or separate sovereigns, that preexisted the Constitution, rather than as independent nations or "foreign states," and denied the Cherokee's motion for an injunction to prevent the State of Georgia from executing certain acts in the territory of the Cherokee Nation. (*Cherokee Nation, supra*, 30 U.S. at pp. 17, 20.) In *Worcester*, the Chief Justice traced the foundation of tribal sovereignty through colonial times and treaties between the tribes and Great Britain and the United States. The court explained that since the arrival of the colonists on American soil, the tribes were treated as dependant sovereign nations, with distinct political communities under the protection and dominion of the United States. (*Worcester, supra*, 31 U.S. at pp. 549–561.) The tribes possessed territorial and governance rights with which no state could interfere. (*Id.* at p. 561.)

■ Tribal sovereign immunity from suit is not synonymous with tribal sovereignty. Rather, it is merely one attribute of the status of Indian tribes as domestic dependant nations. (See *In re Greene* (9th Cir. 1992) 980 F.2d 590, 596.) That tribal sovereign immunity included immunity from suit was a concept developed "almost by accident" in *Turner v. United States* (1919) 248 U.S. 354 [63 L.Ed. 291, 39 S.Ct. 109]. (*Kiowa Tribe, supra*, 523 U.S. at p. 756.) *Turner* involved a suit for damages by a non-Indian who had purchased tribal members' grazing rights. There, "for the sake of argument," (*Kiowa Tribe* at p. 757) the high court made a "passing reference to immunity." (*Ibid.*) The concept of tribal immunity was elevated from dictum to holding in *United States v. United States Fidelity & Guaranty Co.* (1940) 309 U.S. 506 [84 L.Ed. 894, 60 S.Ct. 653] (Indian nations are exempt from suit without congressional authorization). There the court held that as sovereigns or quasi-sovereigns, a suit against any of the Indian tribes must fail absent the tribe's consent to be sued. (*Id.* at pp. 513–514.) "Later cases, albeit with little analysis, reiterated the doctrine." (*Kiowa Tribe, supra*, 523 U.S. at p. 757; see, e.g., *Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 58 [56 L.Ed.2d 106, 98 S.Ct. 1670]; *Puyallup Tribe v. Washington Game Dept.* (1977) 433 U.S. 165, 167, 173 [53 L.Ed.2d 667, 97 S.Ct. 2616].)

The general rule still holds that although Indian tribes are not immune from lawsuits filed against them by the United States, the Indian tribes' sovereign status affords them immunity from state jurisdiction. (See Cohen, Handbook of Federal Indian Law (2005 ed.) § 7.05[1][a], p. 636 (Cohen).) "Although the immunity extends to entities that are arms of the tribes, it apparently does not cover tribally chartered corporations that are completely

independent of the tribe. Nor does the immunity extend to members of the tribe just because of their status as members. . . . When tribal officials act outside the bounds of their lawful authority, however, most courts would extend the doctrine of *Ex Parte Young* [(1908) 209 U.S. 123 [52 L.Ed. 714, 28 S.Ct. 441]] to allow suits against the officials, at least for declaratory or injunctive relief." (Cohen, *supra*, § 7.05[1][a], pp. 636–637, fns. omitted.)

Recent United States Supreme Court cases have favored a preemption analysis in determining the enforceability of a state statute regulating Indian affairs. (E.g., *Three Affiliated Tribes v. Wold Engineering* (1986) 476 U.S. 877, 884 [90 L.Ed.2d 881, 106 S.Ct. 2305].) There, the court analyzed the issue according to principles of federal preemption in rejecting North Dakota's plan to implement a statutory mutual jurisdiction scheme that required an Indian tribe to disclaim its immunity from suit in order to file suit in state court. (*Id.* at p. 878; see also *White Mountain Apache Tribe v. Bracker* (1980) 448 U.S. 136, 145 [65 L.Ed.2d 665, 100 S.Ct. 2578] [federal preemption analysis involves balancing "state, federal, and tribal interests at state"].)

Other cases upheld federal statutes affecting Indian tribes under a sovereign immunity rationale where federal statutes were deemed to be "reasonably and rationally designed to further Indian self-government." (*Morton v. Mancari* (1974) 417 U.S. 535, 555 [41 L.Ed.2d 290, 94 S.Ct. 2474].) *Morton* described Congress's power to address the "special problems of Indians" that stemmed from " '[dis]possession of their lands, sometimes by force, leaving them an uneducated, helpless and dependent people, needing protection against the selfishness of others and their own improvidence.' " (*Id.* at pp. 551–552.) Significantly, *Morton* noted that "[l]iterally every piece of legislation dealing with Indian tribes and reservations, and certainly all legislation dealing with the BIA [Bureau of Indian Affairs], single out for special treatment a constituency of tribal Indians living on or near reservations." (*Id.* at p. 552.) On this basis, the high court rejected a constitutional challenge against a federal statute that provided for Indian hiring preferences within the BIA. (*Id.* at pp. 554–555; see also *City of Roseville v. Norton* (D.D.C. 2002) 219 F.Supp.2d 130 [federal government has authority to set land aside for Indian casino operation and rejecting Tenth Amendment argument opposing the taking].)

The Tribe asserts that sovereign immunity from suit has a constitutional basis because the federal Constitution provides Congress with plenary power over Indian affairs. The Tribe, however, fails to cite any authority that specifically states that tribal immunity from suit is a constitutional imperative.

Indeed, the federal Constitution is silent regarding state action into sovereign immunity questions.

Some high court cases do rely on the plenary powers of Congress to support the immunity doctrine's application. For example, *Worcester* commented that the United States Constitution "confers on congress the powers of war and peace; of making treaties, and of regulating commerce with foreign nations, and among the several States, and *with the Indian tribes.* [(U.S. Const., art. I, § 8, cl. 3.)] These powers comprehend all that is required for the regulation of our intercourse with the Indians." (*Worcester, supra*, 31 U.S. at p. 559.)

The Tribe points out that the high court has interpreted the Indian commerce clause to mean that Indian relations are the "exclusive province of federal law." (*Oneida County v. Oneida Indian Nation* (1985) 470 U.S. 226, 234 [84 L.Ed.2d 169, 105 S.Ct. 1245]; see *Cotton Petroleum Corp. v. New Mexico* (1989) 490 U.S. 163, 192 [104 L.Ed.2d 209, 109 S.Ct. 1698] ["central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs"]; *Montana v. Blackfeet Tribe* (1985) 471 U.S. 759, 764 [85 L.Ed.2d 753, 105 S.Ct. 2399] ["Constitution vests . . . Federal Government with exclusive authority over relations with Indian tribes"].)

■ As the Court of Appeal observed, the Indian commerce clause of article I, section 8, of the federal Constitution "cannot support tribal immunity in this case because (1) it grants a power to Congress, and Congress has not granted the tribe immunity from this suit, and (2) it concerns the regulation of commerce, and this case concerns not commerce but rather the political process." The United States Supreme Court has described the commerce clause as a potential barrier to the exercise of state authority if the state authority interferes with "commercial activity on an Indian reservation." (*Ramah Navajo School Bd. v. Bureau of Revenue* (1982) 458 U.S. 832, 837 [73 L.Ed.2d 1174, 102 S.Ct. 3394] [federal law may preempt state authority if it interferes with tribe's ability to exercise its sovereign functions].) Here, the PRA involves no interference with activity, commercial or otherwise, or sovereign functions, on or near the Tribe's reservation. Indeed, this case presents a state interest that is beyond the commercial and regulatory interests involved in the Indian commerce clause cases.

The treaty clause of the federal Constitution has been recognized in some cases as another potential source of plenary federal authority over Indian tribes. (U.S. Const., art. II, § 2, cl. 2; see *United States v. Lara* (2004) 541 U.S.

193 [158 L.Ed.2d 420, 124 S.Ct. 1628] [Indian relations became exclusive province of federal law after Constitution ratified].) The Court of Appeal pointed out, however, that authority for applying the tribal immunity doctrine in this case cannot be premised on the treaty clause "because the Tribe has cited no treaty that exists between it and the federal government." As the high court recently recognized, since 1871 Congress has not had the power to negotiate new treaties with Indian tribes. (*Lara, supra,* 541 U.S. at p. 201; see 25 U.S.C. § 71 [retaining Congress's plenary powers to legislate on Indian affairs, but recognizing tribes are not entities with whom United States may contract by treaties].)

■ The supremacy clause of the federal Constitution (U.S. Const., art. VI, cl. 2) may serve as a basis for preemption of state law where it conflicts with congressional legislation or federal common law in the realm of Indian affairs. (See *Boisclair v. Superior Court* (1990) 51 Cal.3d 1140, 1148 [276 Cal.Rptr. 62, 801 P.2d 305], citing Cohen, *supra,* (1982 ed.) pp. 207–208, 270–271.) The Court of Appeal, however, correctly observed that the supremacy clause does not "suggest that the doctrine of tribal immunity is other than a common law rule. The supremacy clause tells us that federal law trumps state law, but it does not provide textual support for adoption of the law in the first place."

### C. *Recent Case Law on Sovereign Immunity from Suit*

In *Kiowa Tribe,* the high court addressed the issue whether recognized Indian tribes enjoy immunity from suit on contracts, regardless of whether those contracts were made on or off a reservation or involved governmental or commercial activities. (*Kiowa Tribe, supra,* 523 U.S. at p. 755.) The Kiowa Tribe's industrial development commission agreed to purchase corporate stock from a technology company and gave a promissory note as part of the transaction. (*Id.* at pp. 753–754.) Under the note, the Kiowa Tribe agreed to pay the company $285,000 plus interest. The face of the note indicated it was signed in Carnegie, Oklahoma, where the Kiowa Tribe has a complex held for it in trust. (*Ibid.*) According to the technology company, however, the Kiowa Tribe executed and delivered the note in Oklahoma City, beyond its tribal lands. The Kiowa Tribe's payments were also to be made in Oklahoma City. Although the note did not specify governing law, it did contain a paragraph entitled " 'Waivers and Governing Law.' " (*Id.* at p. 754.) That paragraph provided in part that, *"Nothing in this Note subjects or limits the sovereign rights of the Kiowa Tribe of Oklahoma."* (*Ibid.,* italics added.) When the tribe defaulted on the note, the technology company sued in state court for repayment. The Kiowa Tribe moved to dismiss for lack of jurisdiction,

relying in part on its sovereign immunity from suit and state court jurisdiction. (*Ibid.*)

*Kiowa Tribe* held that as "a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." (*Kiowa Tribe, supra,* 523 U.S. at p. 754; see also *Oklahoma Tax Comm'n v. Potawatomi Tribe* (1991) 498 U.S. 505, 509 [112 L.Ed.2d 1112, 111 S.Ct. 905] (*Potawatomi Tribe*) [sovereign immunity protects Indian tribes from suit to collect taxes from cigarette sales on Indian land absent clear waiver or congressional abrogation]; *Santa Clara Pueblo v. Martinez, supra,* 436 U.S. at p. 49, 58 [tribal immunity from suit subject to congressional plenary control].) Although the respondent technology company asked the court to confine tribal sovereign immunity to activities occurring on reservations or to issues involving tribal governance, the court observed that "our precedents have not drawn these distinctions." (*Kiowa Tribe, supra,* 523 U.S. at p. 755.)

Writing for the *Kiowa Tribe* majority, while doubting "the wisdom of perpetuating the [sovereign immunity] doctrine," Justice Kennedy observed that "[t]o date, our cases have sustained tribal immunity from suit without drawing a distinction based on where the tribal activities occurred." (*Kiowa Tribe, supra,* 523 U.S. at p. 754.) *Kiowa Tribe* made several observations, however, about the doctrine of sovereign immunity that provide the foundation for our departure from the doctrine within the context of the present action.

Initially, *Kiowa Tribe* observed that like foreign sovereign immunity, tribal sovereign immunity has historically been applied as a matter of federal law, not constitutional law. "In *Blatchford* [*v. Native Village of Noatak* (1991) 501 U.S. 775 [115 L.Ed.2d 686, 111 S.Ct. 2578]] we distinguished state sovereign immunity from tribal sovereign immunity, as tribes were not at the Constitutional Convention. They were thus not parties to the 'mutuality of . . . concession' that 'makes the States' surrender of immunity from suit by sister States plausible.' [Citations.] So tribal immunity is a matter of federal law and is not subject to diminution by the States. *Three Affiliated Tribes, supra,* [476 U.S.] at [p.] 891; *Washington v. Confederated Tribes of Colville Reservation,* 447 U.S. 134, 154 [65 L.Ed.2d 10, 100 S.Ct. 2069] (1980)." (*Kiowa Tribe, supra,* 523 U.S. at p. 756.)

*Kiowa Tribe* discussed several "reasons to doubt the wisdom of perpetuating the doctrine." (*Kiowa Tribe, supra,* 523 U.S. at p. 758.) The court noted that once the doctrine "might have been thought necessary to protect nascent

tribal governments from encroachments by States. In our interdependent and mobile society, however, tribal immunity extends beyond what is needed to safeguard tribal self-governance. This is evident when tribes take part in the Nation's commerce. Tribal enterprises now include ski resorts, gambling, and sales of cigarettes to non-Indians. See *Mescalero Apache Tribe v. Jones,* 411 U.S. 145 [36 L.Ed.2d 114, 93 S.Ct. 1267] (1973); *Potawatomi [Tribe], supra*[, 498 U.S. 505]; *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44 [134 L.Ed.2d 252, 116 S.Ct. 1114] (1996). In this economic context, immunity can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims.

"These considerations might suggest a need to abrogate tribal immunity, at least as an overarching rule. Respondent does not ask us to repudiate the principle outright, but suggests instead that we confine it to reservations or to noncommercial activities. We decline to draw this distinction in this case, as we defer to the role Congress may wish to exercise in this important judgment." *(Kiowa Tribe, supra,* 523 U.S. at p. 758.)

As *Kiowa Tribe* observed, Congress has acted against the background of the court's decisions and restricted immunity in limited circumstances, including liability insurance and gaming activities. *(Kiowa Tribe, supra,* 523 U.S. at p. 758; see, e.g., 25 U.S.C. §§ 450f(c)(3) [mandatory liability insurance],[3] 2710(d)(7)(A)(ii) [gaming activities].)

*Kiowa Tribe* also recognized that similar problems exist in the doctrine of sovereign immunity for foreign countries, problems that have, as in tribal immunity, existed since immunity began as a judicial doctrine. (See *The Exchange* (1812) 11 U.S. 116 [3 L.Ed. 287] [no jurisdiction over armed ship of foreign state even while in American port].) The court observed that "while the holding [in *The Exchange*] was narrow," the opinion was regarded as standing for the proposition that foreign sovereigns had absolute immunity from United States jurisdiction. *(Kiowa Tribe, supra,* 523 U.S. at p. 759.) Because foreign sovereign immunity was difficult to implement, Congress passed the Foreign Sovereign Immunities Act in 1976, "resulting in more predictable and precise rules." *(Kiowa Tribe, supra,* 523 U.S. at p. 759; see *Verlinden B. V. v. Central Bank of Nigeria* (1983) 461 U.S. 480, 488–489 [76 L.Ed.2d 81, 103 S.Ct. 1962] [discussing Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1604, 1605, 1607].)

---

[3] Even 25 United States Code section 450f(c)(3), limiting tribal immunity on mandatory insurance, provides that, "such waiver [of tribal immunity] shall not authorize or empower such insurance carrier to waive or otherwise limit the tribe's sovereign immunity outside or beyond the coverage or limits of the policy of insurance."

Drawing the parallel between foreign and tribal sovereign immunity, in *Kiowa Tribe* the court noted that like foreign sovereign immunity, tribal immunity is a matter of federal law and thus only Congress can alter immunity limits through "explicit legislation." (*Kiowa Tribe, supra*, 523 U.S. at p. 759.) The court stated that although "a State may have authority to tax or regulate tribal activities occurring within the State but outside Indian country," that "is not to say that a tribe no longer enjoys immunity from suit. . . . There is a difference between the right to demand compliance with state laws and the means available to enforce them." (*Id.* at p. 755.) *Kiowa Tribe* expressed the view that Congress is traditionally in a "position to weigh and accommodate the competing policy concerns and reliance interests. The capacity of the Legislative Branch to address the issue by comprehensive legislation counsels some caution by us in this area." (*Kiowa Tribe, supra*, 523 U.S. at p. 759.)

Although Justice Stevens agreed with the *Kiowa Tribe* majority's comment that "it is now too late to repudiate the doctrine entirely," he stated reasons why he would not extend the doctrine "to purely off-reservation conduct." (*Kiowa Tribe, supra*, 523 U.S. at p. 764 (dis. opn. of Stevens, J.).) Joined by Justices Thomas and Ginsburg, Justice Stevens believed that in the absence of any congressional statute or treaty, the court created a federal common law rule by " 'default' " that "lacks . . . justification" and "completely ignores [states'] interests." (*Id.* at p. 765.) He also found the rule anomalous in that it allows the tribes to enjoy "broader immunity than the States, the Federal Government, and foreign nations." (*Ibid.*)

Indeed, unlike tribal members, foreign governments are prohibited from participating in our elections. (See 2 U.S.C. § 441e; 22 U.S.C. § 611(b)(1).) Foreign sovereign immunity has been judicially abrogated in several important respects, particularly since the enactment of the Foreign Sovereign Immunities Act of 1976, under which Congress expanded the general exceptions to the jurisdictional immunity of a foreign state beyond the area of commercial activity into private acts. (See 28 U.S.C. §§ 1602–1605(a) & (b) [instances where foreign state not immune from jurisdiction of the United States].) Justice Stevens generally considered the sovereign immunity from suit rule unjust and unfair in that all governments should be held responsible for their debts as well as their injurious or unlawful conduct. (*Kiowa Tribe, supra*, 523 U.S. at p. 766 (dis. opn. of Stevens, J.).)

*Kiowa Tribe* relied in part on *Potawatomi Tribe*, where the high court rejected the State of Oklahoma's invitation to construe more narrowly, or abandon entirely, the doctrine of sovereign immunity in order that it might

impose a cigarette tax on tribal cigarette sales. (*Potawatomi Tribe, supra*, 498 U.S. at p. 510.) Oklahoma contended "that the tribal sovereign immunity doctrine impermissibly burdens the administration of state tax laws." (*Ibid.*) The state asserted that because cigarette sales are "so detached from traditional tribal interests," the Potawatomi's should not enjoy immunity from enforcement efforts. (*Ibid.*) The state believed that the sovereign immunity doctrine "should be limited to the tribal courts and the internal affairs of tribal government, because no purpose is served by insulating tribal business ventures from the authority of the States to administer their laws." (*Ibid.*)

Writing for the majority, Chief Justice Rehnquist rejected Oklahoma's argument for abandoning the immunity doctrine in the commercial context presented. The court disagreed with Oklahoma's contention that giving it the ability to require Indian retailers to collect taxes without the corresponding ability to sue to recover the taxes was giving it a "right without any remedy." (*Potawatomi Tribe, supra*, 498 U.S. at p. 514.) "Although Congress has occasionally authorized limited classes of suits against Indian tribes, it has never authorized suits to enforce tax assessments. Instead, Congress has consistently reiterated its approval of the immunity doctrine. See, *e.g.*, Indian Financing Act of 1974, 88 Stat. 77, 25 U.S.C. § 1451 *et seq.*, and the Indian Self-Determination and Education Assistance Act, 88 Stat. 2203, 25 U.S.C. § 450 *et seq*. These Acts reflect Congress' desire to promote the 'goal of Indian self-government, including its "overriding goal" of encouraging tribal self-sufficiency and economic development.' *California* v. *Cabazon Band of Mission Indians*, 480 U.S. 202, 216 [94 L.Ed.2d 244, 107 S.Ct. 1083] (1987)." (*Potawatomi Tribe, supra*, 498 U.S. at p. 510.) Justice Stevens concurred in the judgment, although he noted that he found the Indian sovereign immunity doctrine "anachronistic." (*Potawatomi Tribe, supra*, 498 U.S. at p. 514 (conc. opn. of Stevens, J.).)

Thus, in light of *Kiowa Tribe, supra*, 523 U.S. 759, and its progeny, the United States Supreme Court, while consistently affirming the sovereign immunity doctrine, has grown increasingly critical of its continued application in light of the changed status of Indian tribes as viable economic and political nations. Although the high court has not abrogated sovereign immunity from suit in a context such as the present one, it has in other contexts recognized the common law evolution of certain limitations on tribal exercise of regulatory and judicial jurisdiction. (See, e.g., *Strate v. A-1 Contractors* (1997) 520 U.S. 438 [137 L.Ed.2d 661, 117 S.Ct. 1404] [tribal court may not exercise subject matter jurisdiction in personal injury suit between non-Indians on highway that bordered, and in part entered, Indian reservation]; see also *Nevada v. Hall* (1979) 440 U.S. 410, 417–419 [59 L.Ed.2d 416, 99 S.Ct. 1182].)

IV. *Tenth Amendment and Guarantee Clause*

A. *The Parties' Contentions*

■ Like the Court of Appeal, the FPPC distinguishes high court precedent from the present case. This case, it asserts, falls outside the realm of congressional plenary power because it implicates the state's right to preserve its republican form of government under the guarantee clause (art. IV, § 4) of the United States Constitution together with its reserved right under the Tenth Amendment to the United States Constitution.[4] The FPPC contends that because the present action concerns the state's political process, the state's enforcement of the PRA is an exercise of constitutionally protected powers. Additionally, it contends, the state's activities do not involve the regulation of commerce and do not encroach on the authority of treaty or congressional legislation. As the FPPC observes, several of the United States Supreme Court's recent decisions have recognized that the federal Constitution's article IV, section 4 guarantee to the states and the reserved powers granted to the states under the Tenth Amendment present constitutional limitations on Congress's plenary powers under the commerce clause of article I, section 8, clause 3 of the federal Constitution.

The Tribe does not dispute the power of the state to regulate political campaigns under the PRA, nor does the Tribe dispute that it is generally subject to those regulations. (See generally *Mescalero Apache Tribe v. Jones* (1973) 411 U.S. 145, 148–149 [36 L.Ed.2d 114, 93 S.Ct. 1267] [tribal members beyond reservation boundaries are subject to nondiscriminatory state law applicable to all state citizens].) Rather, the Tribe asserts that the state cannot sue to enforce those regulations. In opposing the FPPC's Tenth Amendment and guarantee clause contentions, the Tribe relies in particular on *City of Roseville v. Norton, supra,* 219 F.Supp.2d at pages 153–154, and *Carcieri v. Norton* (D.R.I. 2003) 290 F.Supp.2d 167, in which the federal district court held that the federal Department of the Interior's placing a parcel of land into a trust for an Indian tribe did not violate the Tenth Amendment.

However, *Roseville* and *Carcieri* involved challenges to federal legislation aimed at the Indian tribes' activity occurring on or near the reservation. (See also *Matter of Guardianship of D.L.L. & C.L.L.* (S.D. 1980) 291 N.W.2d 278,

---

[4] Article IV, section 4 of the United States Constitution states that, "The United States shall guarantee to every state in this union a republican form of government, and shall protect each of them against invasion; and on application of the legislature, or of the executive (when the legislature cannot be convened) against domestic violence." The Tenth Amendment to the United States Constitution reserves, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the states . . . ."

280–281 [Indian Child Welfare Act does not infringe on state's Tenth Amendment powers over domestic relations cases].) As such, those cases have at best minimal bearing on the matter before us.

B. *Discussion*

■ Historically, under the Tenth Amendment's reservation of powers to the states, and the guarantee clause, a republican form of government has been reserved and guaranteed "to every state in the Union, and the distinguishing feature of that form is the right of the people to choose their own officers for governmental administration." (*Duncan v. McCall* (1891) 139 U.S. 449, 461 [35 L.Ed. 219, 11 S.Ct. 573].)

Since at least 1941, the high court had refused to read the Tenth Amendment as a cap on congressional power, instead interpreting that provision as a "truism." (*United States v. Darby* (1941) 312 U.S. 100, 124 [85 L.Ed. 609, 61 S.Ct. 451].) In 1976, however, in a majority opinion authored by Chief Justice Rehnquist, the court held that the Tenth Amendment limited congressional power to legislate under the commerce clause. (*National League of Cities v. Usery* (1976) 426 U.S. 833 [49 L.Ed.2d 245, 96 S.Ct. 2465].) The Tenth Amendment, the court concluded, sheltered "the States' freedom to structure integral operations in areas of traditional governmental functions." (*National League of Cities, supra*, 426 U.S. at p. 852.) Congress, therefore, could not "directly displace" (*ibid.*) that freedom by limiting " 'essentials of state sovereignty.' " (*Id.* at p. 855.) The decision held the Tenth Amendment to be an affirmative limit on congressional power and reshaped federal-state relations. (Merritt, *The Guarantee Clause and State Autonomy: Federalism for a Third Century* (1988) 88 Colum. L.Rev. 1 (Merritt).)

Less than 10 years later, the high court overruled *National League of Cities*. In *Garcia v. San Antonio Metro. Transit Auth.* (1985) 469 U.S. 528 [83 L.Ed.2d 1016, 105 S.Ct. 1005], a majority of the court expressed the view that the principal protection for state sovereignty "lies in the structure of the Federal Government" rather than in the Tenth Amendment or any other judicially enforceable constitutional provision. (469 U.S. at p. 550.) *Garcia* reasoned that the federal Constitution's Framers protected the interests of state governments by giving states equal representation in the Senate and allowing states to choose Senators and electors. The courts could interfere with congressional regulation of the states only if the states could point to specific "failings in the national political process." (*Id.* at p. 554.) In his dissent, Justice Rehnquist reiterated that the " 'balancing test' approved in *National League of Cities* . . . recognized that Congress could not act under commerce power to infringe on certain fundamental aspects of state sovereignty that are essential to 'the States' separate and independent existence.' " (*Id.* at p. 579 (dis. opn. of Rehnquist, J.).)

Legal scholars soon criticized *Garcia* for weakening constitutional protections of state autonomy. For example, Professor Merritt observed that "[p]ermitting a majority of Congress to override constitutional limits on state autonomy . . . disregards the express language of article V. Under that provision, changes in the constitutional balance of powers may be achieved only by a constitutional amendment garnering support from two-thirds of the members of Congress, as well as three-fourths of the states. A bare majority of Congress is never sufficient to amend the Constitution; yet *Garcia's* logic appears to give Congress just that power." (Merritt, *supra*, 88 Colum. L.Rev. at p. 19, fn. omitted, citing *Oregon v. Mitchell* (1970) 400 U.S. 112, 201 [27 L.Ed.2d 272, 91 S.Ct. 260] (conc. & dis. opn. of Harlan, J.).) Professor Van Alstyne also criticized *Garcia* for overruling *National League of Cities*, and asserted that in deferring to the political process over judicial review, *Garcia* partially repudiated the court's power of judicial review under *Marbury v. Madison* (1803) 5 U.S. 137 [2 L.Ed. 60]. (Van Alstyne, *The Second Death of Federalism* (1985) 83 Mich. L.Rev. 1709, 1721.)

Six years after *Garcia*, the court further modified its view of the Tenth Amendment's vitality in constitutional jurisprudence. The court found that the Missouri Constitution's mandatory retirement provision, as applied to appointed judges who survived retention elections, did not violate the Age Discrimination in Employment Act of 1967 (29 U.S.C. § 621 et seq.). (*Gregory v. Ashcroft* (1991) 501 U.S. 452 [115 L.Ed.2d 410, 111 S.Ct. 2395] (*Gregory*).) In upholding the state's right to prescribe a mandatory retirement age for the appointed judges, and rejecting the judges' equal protection claim under the Fourteenth Amendment, *Gregory* noted that the states' power to determine the qualifications of their governmental officials derived from both the Tenth Amendment and the guarantee clause of article IV, section 4 of the federal Constitution. In so holding, the court relied on a recent line of authority that acknowledged the "unique nature of state decisions that 'go to the heart of representative government.' " (*Gregory, supra*, 501 U.S. at p. 461, quoting *Sugarman v. Dougall* (1973) 413 U.S. 634, 647 [37 L.Ed.2d 853, 93 S.Ct. 2842] [striking New York City law that banned employment of aliens].)

In recognizing the state's constitutional power to establish the qualifications of its governmental officers, *Gregory* observed that the Tenth Amendment and the guarantee clause provide an important check on Congress's power to interfere with the state's "substantial sovereign powers under our constitutional scheme." (*Gregory, supra*, 501 U.S. at p. 461.) The court emphasized that the states' power to keep for themselves the power "to determine the qualifications of their most important government officials" derived from the guarantee clause and the Tenth Amendment. (*Gregory, supra*, 501 U.S. at p. 463.) These powers, the court observed, inhere in the state by

way of its " 'obligation . . . "to preserve the basic conception of a political community." [Citations.]' " (*Gregory, supra,* 501 U.S. at p. 462.)

One year later, the high court decided *New York v. United States* (1992) 505 U.S. 144 [120 L.Ed.2d 120, 112 S.Ct. 2408] (*New York*). *New York* struck a provision of the Low-Level Radioactive Waste Policy Amendments Act of 1985 (42 U.S.C. § 2021b et seq.), commanding states either to enact laws regulating the disposal of low-level radioactive waste or to take title to all such waste generated within their borders. (*New York, supra,* 505 U.S. at p. 149.) The court distinguished between congressional power "to pass laws requiring or prohibiting certain acts" by private parties and congressional attempts "to compel the States to require or prohibit those acts." (*Id.* at p. 166.) The court discussed the guarantee clause, although it concluded that the constitutional provision was not implicated because "neither the monetary incentives provided by the Act nor the possibility that a State's waste producers may find themselves excluded from the disposal sites of another State can reasonably be said to deny any State a republican form of government." (*New York, supra,* 505 U.S. at p. 185.) Noting that the provision has been an infrequent source of litigation throughout history, the court did note that most claims presented under article IV, section 4 of the federal Constitution have been "nonjusticiable under the 'political question' doctrine." (*New York, supra,* 505 U.S. at p. 184.)

■ The court also found the guarantee clause inapplicable in part because "state government officials remain[ed] accountable to the local electorate." (*New York, supra,* 505 U.S. at p. 185.) The court did note, however, that it has recognized "that perhaps not all claims under the Guarantee Clause present nonjusticiable political questions. See *Reynolds v. Sims,* 377 U.S. 533, 582 [12 L.Ed.2d 506, 84 S.Ct. 1362] (1964) ('[s]ome questions raised under the Guarantee Clause are nonjusticiable'). Contemporary commentators have likewise suggested that courts should address the merits of such claims, at least in some circumstances. See, *e.g.,* L. Tribe, American Constitutional Law 398 (2d ed. 1988); J. Ely, Democracy and Distrust: A Theory of Judicial Review 118, n., and 122–123 (1980); W. Wiecek, The Guarantee Clause of the U. S. Constitution 287–298, 300 (1972); Merritt, [*supra,*] 88 Colum. L.Rev., at 70–78; Bonfield, The Guarantee Clause of Article IV, Section 4: A Study in Constitutional Desuetude, 46 Minn. L.Rev. 513, 560–565 (1962)." (*New York, supra,* 505 U.S. at p. 185.)

Professor Tribe has more recently observed that although the guarantee of article IV, section 4 of the federal Constitution was intended to guard against " 'aristocratic or monarchial innovations,' " it was also the case that the federal Constitution "presupposed that neither the states nor the federal government could undermine ultimate popular control over certain state

officials, their qualifications, and the state lawmaking process." (1 Tribe, American Constitutional Law (3d ed. 2000) §§ 5-12, p. 909, discussing *Gregory, supra*, 501 U.S. at p. 463.) Other legal scholars agree. As Professor Merritt observed in an article following *New York*'s publication, both *New York* and *Gregory* suggest that the United States Supreme Court may be poised to recognize a new meaning of the guarantee clause: a promise by the national government to avoid interfering with state governments in ways that would compromise a republican form of government. (Merritt, *Republican Governments and Autonomous States: A New Role for the Guarantee Clause* (1994) 65 U. Colo. L.Rev. 815, 821–822.)

■ The Tribe correctly notes that the high court has not applied the Tenth Amendment or the guarantee clause to uphold a state's enforcement of a state election provision against a sovereign tribe. But neither has the court held that the federal common law doctrine of tribal sovereign immunity trumps state authority when a state acts in political " 'matters resting firmly within [its] constitutional prerogatives. [*Sugarman v. Dougall, supra*, 413 U.S.] at [p.] 648.' " (*Gregory, supra*, 501 U.S. at p. 462.) Tribal members, as citizens of the United States, are allowed to participate in state elections. Allowing the Tribe immunity from suit in this context would allow tribal members to participate in elections and make campaign contributions (using the tribal organization) unfettered by regulations designed to ensure the system's integrity. Allowing tribal members to participate in our state electoral process while leaving the state powerless to effectively guard against political corruption puts the state in an untenable and indefensible position without recourse. Given the unique facts here, we agree with the Court of Appeal and conclude that the guarantee clause, together with the rights reserved under the Tenth Amendment, provide the FPPC authority under the federal Constitution to bring suit against the Tribe in its enforcement of the PRA.

### C. *Alternatives to PRA Enforcement*

The Tribe asserts that if we allow the FPPC to file suit against it, we will undermine the foundation of the Tribe's sovereign immunity and open the floodgates to future suits against it. Conversely, the Tribe contends that if we do not allow the suit to proceed, we will not significantly impair the state's right to regulate the electoral process and preserve its republican form of government. In other words, the Tribe, and the Court of Appeal dissent, assert that depriving the state of one of its "tools" under the PRA does not seriously compromise the state's right to regulate its electoral processes. According to both, recourse to suit is largely unnecessary here because the PRA also requires recipients of campaign donations to report the donations.

As amicus curiae California Common Cause points out in its brief (and counsel for the FPPC observed during oral argument), "there is not always a recipient to report a tribe's campaign financing. For example, if [a tribe] were to make independent expenditures on behalf of a candidate or in support of a ballot measure, no one would ever know about it. . . . There is no reporting by the recipient because there is no recipient." Additionally, the PRA's dual reporting requirement detects and prevents any misreporting that might occur if recipients knew that donors or lobbyist employers were not reporting them. As the Court of Appeal observes, "it stands to reason that the requirement for both payor and payee to file disclosure statements will act as a check to discourage omissions by one or the other. Thus, the fact that recipients are supposed to report contributions does not constitute an alternative method of enforcement."

The Tribe contends that other viable remedies exist for the state to accomplish its goals under the PRA including: pursuing a government-to-government agreement, petitioning Congress to make an exception to the sovereign immunity doctrine, and acquiring the information from alternative sources (e.g., recipients of campaign contributions). But as the Court of Appeal reasoned, "[t]hese alternatives are uncertain; they do not persuade us to apply tribal immunity to bar this action to enforce the PRA. Moreover, absent the threat of a lawsuit, we see no incentive for the tribe to agree to comply with the FPPC reporting requirements." To the extent that the Tribe suggests encouraging Congress to solve the problem tribal immunity presents in this case, it is a proposal with a highly unpredictable outcome. "[A]t the time the Court deliberated over and rendered its decision in *Kiowa Tribe,* [Congress] was actively considering the [tribal immunity] doctrine, and the Court was aware of this fact. After months of deliberation and Congressional hearings, however, Congress declined to implement the sweeping changes recommended by the Court. In 2000 Congress enacted legislation that, in the end, had little substantive impact on the scope of tribal immunity." (Seielstad, *The Recognition and Evolution of Tribal Sovereign Immunity Under Federal Law: Legal, Historical, and Normative Reflections on a Fundamental Aspect of American Indian Sovereignty* (2002) 37 Tulsa L.Rev. 661, 665–666, fns. omitted.)

■ The inability to enforce the PRA against the Tribe, a major donor to political campaigns, has the effect of substantially weakening the PRA. The State of California has determined that the PRA is vitally important to its republican form of government. (See, e.g., *McConnell v. Federal Election Comm'n* (2003) 540 U.S. 93, 187 [157 L.Ed.2d 491, 124 S.Ct. 619] [Congress has "a fully legitimate interest in maintaining the integrity of federal officeholders and preventing corruption of federal electoral processes"— campaign contribution limits pass First Amendment scrutiny].) Therefore, this case differs substantially from cases concerning application of sovereign

immunity involving a tribe's contracts or commercial ventures, its courts and governing bodies, or tribal lands. We conclude that the FPPC should not be forced to rely on the alternative sources the Tribe suggests for obtaining the information the PRA requires. Preserving the integrity of our democratic system of governance is too important to compromise with weak alternative measures that the state may not be able to enforce. (See, e.g., *Nixon v. Shrink Missouri Government PAC* (2000) 528 U.S. 377, 388 [145 L.Ed.2d 886, 120 S.Ct. 897].)[5]

## CONCLUSION

■ In light of evolving United States Supreme Court precedent and the constitutionally significant importance of the state's ability to provide a transparent election process with rules that apply equally to all parties who enter the electoral fray, we find the FPPC states the better case. Although concepts of tribal immunity have long-standing application under federal law, the state's exercise of state sovereignty in the form of regulating its electoral process is protected under the Tenth Amendment and the guarantee clause. We therefore find that the Tribe lacks immunity from suit for its alleged failure to follow the PRA's mandated reporting requirements. In so holding, we recognize that our abrogation of the sovereign immunity doctrine under these facts is narrow and carefully circumscribed to apply only in cases where California, through its Fair Political Practices Commission, sues an Indian tribe for violations of state fair political practice laws. We thus affirm the Court of Appeal judgment and remand for proceedings consistent with our ruling.

George, C. J., Baxter, J., and Corrigan, J., concurred.

**MORENO, J.,** Dissenting.—I dissent. The majority attempts to carve out an exception to the well-established rule that Indian tribes are immune from suit absent congressional authorization. As explained below, United States Supreme Court precedent does not support the creation of this exception. Although the enforcement of the Political Reform Act of 1974 (PRA) (Gov.

---

[5] In a letter brief filed on January 20, 2006, the Tribe cites two California cases it believes support its sovereign immunity claim. (*Big Valley Band of Pomo Indians v. Superior Court* (2005) 133 Cal.App.4th 1185, 1195–1196 [35 Cal.Rptr.3d 357] [tribe's consent to arbitration is limited waiver of sovereign immunity only and does not waive suit immunity under federal law]; *Lamere v. Superior Court* (2005) 131 Cal.App.4th 1059, 1065 [31 Cal.Rptr.3d 880] [rejecting argument that "Public Law 280" (28 U.S.C. § 1360), granting state court limited jurisdiction over some tribal actions (mostly criminal), authorized suit involving tribe membership issues].) We find the cases, which rely on traditional notions tribal sovereignty, inapposite to the unique issue raised in the present case.

Code, § 81000 et seq.)[1] is a highly desirable objective, the means approved by the majority to accomplish that objective unjustifiably circumvents well-established Indian sovereignty principles and cannot be reconciled with controlling federal precedent.

## I.

As recounted in the majority opinion, the Fair Political Practices Commission (FPPC) filed a lawsuit against the Agua Caliente Band of Cahuilla Indians (the Tribe), a federally recognized Indian tribe, alleging a failure to comply with the reporting requirements for campaign contributions under the PRA. The complaint alleged failure to report lobbying interests (§ 86116), late contributions of more than $1 million (§ 84203), and failure to file semiannual campaign statements (§ 84200). The Tribe, specially appearing, filed a motion to quash service of summons for lack of personal jurisdiction on the grounds that it was immune from suit under the doctrine of tribal sovereign immunity. The majority affirms the decision of the Court of Appeal, which in turn affirmed the decision of the trial court, that the application of tribal sovereign immunity in this case would violate the state's ability to order its own electoral processes, a power the majority contends is reserved to the states by the Tenth Amendment to the United States Constitution as well as the guarantee clause, article IV, section 4.

## II.

"Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers. [Citations.] This aspect of tribal sovereignty, like all others, is subject to the superior and plenary control of Congress. But 'without congressional authorization,' the 'Indian Nations are exempt from suit.' " (*Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 58 [56 L.Ed.2d 106, 98 S.Ct. 1670].) "It is settled that a waiver of sovereign immunity ' "cannot be implied but must be unequivocally expressed." ' " (*Ibid.*) "Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories. [Citation.] Suits against Indian tribes are thus barred by sovereign immunity absent a clear waiver by the tribe or congressional abrogation. [Citation.]" (*Oklahoma Tax Comm'n v. Potawatomi Tribe* (1991) 498 U.S. 505, 509 [112 L.Ed.2d 1112, 111 S.Ct. 905] (*Potawatomi Tribe*).) Put another way, "tribal immunity is a matter of federal law and is not subject to diminution by the States." (*Kiowa Tribe of Okla. v. Manufacturing Technologies, Inc.* (1998) 523 U.S. 751, 756 [140 L.Ed.2d 981, 118 S.Ct. 1700] (*Kiowa Tribe*).)

---

[1] All further undesignated statutory references are to the Government Code.

The form tribal immunity has taken stems from the unique historical circumstances in which it arose. As the United States Supreme Court has explained, tribal immunity is to be distinguished from state sovereign immunity, inasmuch as "tribes were not at the Constitutional Convention. They were thus not parties to the 'mutuality of . . . concession' that 'makes the States' surrender of immunity from suit by sister States plausible.' [Citation.]" (*Kiowa Tribe, supra*, 523 U.S. at p. 756.)

Critical to the discussion of tribal immunity is an understanding of the singular role that Congress plays in governing Indian affairs. Congress possesses plenary power "to deal with the special problems of Indians," a power that "is drawn both explicitly and implicitly from the Constitution itself," including the Indian commerce clause, article I, section 8, clause 3 of the federal Constitution, and the treaty clause, article II, section 2, clause 2. (*Morton v. Mancari* (1974) 417 U.S. 535, 551–552 [41 L.Ed.2d 290, 94 S.Ct. 2474].) Congress itself has invoked this plenary, constitutionally based power, as authorization for its own legislation. As it stated in the congressional findings to the Indian Child Welfare Act: "clause 3, section 8, article I of the United States Constitution provides that 'The Congress shall have Power . . . To regulate Commerce . . . with Indian tribes' and, through this and other constitutional authority, Congress has plenary power over Indian affairs." (25 U.S.C. § 1901.)

As such, restrictions on tribal sovereign immunity are the sole province of Congress. (*Kiowa Tribe, supra*, 523 U.S. at p. 756.) It has acted cautiously in this area. "Although Congress has occasionally authorized limited classes of suits against Indian tribes, it has . . . consistently reiterated its approval of the immunity doctrine. See, *e.g.*, Indian Financing Act of 1974, 88 Stat. 77, 25 U.S.C. § 1451 *et seq.*, and the Indian Self-Determination and Education Assistance Act, 88 Stat. 2203, 25 U.S.C. § 450 *et seq.* These Acts reflect Congress' desire to promote the 'goal of Indian self-government, including its "overriding goal" of encouraging tribal self-sufficiency and economic development.' " (*Potawatomi Tribe, supra*, 498 U.S. at p. 510.)

The United States Supreme Court has thus far rejected all attempts to limit Indian lawsuit immunity that have not originated with Congress. In *Three Affiliated Tribes v. Wold Engineering* (1986) 476 U.S. 877, 890–891 [90 L.Ed.2d 881, 106 S.Ct. 2305] (*Three Affiliated Tribes*), the court invalidated a state statute that required Indian tribes to waive their sovereign immunity as a condition for bringing suit in state court, holding, inter alia, that the statute placed an undue burden on Indian sovereignty.

In *Potawatomi Tribe* the court held that, notwithstanding the fact that tribal sales of cigarettes to non-Indians were taxable, the State of Oklahoma could

not sue the tribe to enforce its tax law. In so holding, the court rejected the state's argument "that the tribal sovereign immunity doctrine impermissibly burdens the administration of state tax laws" and that "[t]he sovereignty doctrine . . . should be limited to the tribal courts and the internal affairs of tribal government, because no purpose is served by insulating tribal business ventures from the authority of the States to administer their laws." (*Potawatomi Tribe, supra*, 498 U.S. at pp. 509–510.) Instead, it reaffirmed the principle that Congress alone could restrict the tribe's sovereign immunity. (*Id.* at p. 510.)

In *Kiowa Tribe*, involving a suit over an Indian tribe's default on a promissory note issued in connection with a commercial transaction, the court again rejected the argument that tribal immunity should be limited "to reservations or to noncommercial activities." (*Kiowa Tribe, supra*, 523 U.S. at p. 758.) While expressing doubts about the wisdom of the doctrine, as the majority discusses, the court reaffirmed that doctrine and rejected the proposed limitations: "Congress has acted against the background of our decisions. It has restricted tribal immunity from suit in limited circumstances." (*Ibid.*) After citing many of the same statutes as it did in *Potawatomi Tribe*, the court drew parallels between the doctrine of tribal sovereign immunity and foreign sovereign immunity. Both types of immunity are matters of federal law, and in the latter case, Congress has seen fit to limit the immunity doctrine developed by the courts. (*Ibid.*) "In both fields, Congress is in a position to weigh and accommodate the competing policy concerns and reliance interests. The capacity of the Legislative Branch to address the issue by comprehensive legislation counsels some caution by us in this area. Congress 'has occasionally authorized limited classes of suits against Indian tribes' and 'has always been at liberty to dispense with such tribal immunity or to limit it.' [Citation.] It has not yet done so." (*Kiowa Tribe, supra*, 523 U.S. at p. 759.) The court therefore elected "to defer to Congress" and upheld the tribe's immunity. (*Id.* at p. 760.)

The majority does not controvert the incontrovertible. Rather, it draws the conclusion that "the United States Supreme Court, while consistently affirming the sovereign immunity doctrine, has grown increasingly critical of its continued application in light of the changed status of Indian tribes as viable economic and political nations." (Maj. opn., *ante*, at p. 254.) But it is more accurate to say that the Supreme Court has not wavered from the principle that whatever problems arise from the conflict between Indian and state sovereignty are matters for Congress, exercising its plenary power over Indian affairs, to solve.

## III.

The majority does not claim that the United States Supreme Court is on the brink of abandoning this well-established doctrine of Indian sovereign immunity. Rather, it contends that federal law will or should recognize a narrow exception to the sovereign immunity doctrine under the Tenth Amendment to the United States Constitution and article IV, section 4, the guarantee clause. I do not agree that these provisions authorize the state to limit tribal sovereign immunity.

The Tenth Amendment states that, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the states are reserved to the states respectively, or to the people." Article IV, section 4 states that "The United States shall guarantee to every state in this union a republican form of government, and shall protect each of them against invasion; and on application of the legislature, or of the executive (when the legislature cannot be convened) against domestic violence."

As the majority acknowledges, neither constitutional provision has been interpreted to provide much in the way of limitation on federal power. (See *Garcia v. San Antonio Metro. Transit Auth.* (1985) 469 U.S. 528 [83 L.Ed.2d 1016, 105 S.Ct. 1005].) The only recognized limitation on federal power over the states that has any basis in the Tenth Amendment has been the restriction of congressional legislation that would compel states to enact or administer a federal regulatory program. (See *Printz v. United States* (1997) 521 U.S. 898, 919, 933 [138 L.Ed.2d 914, 117 S.Ct. 2365].) No such federal commandeering of state government is at issue here.

The guarantee clause provides even less support for the majority's position. As James Madison stated in explaining the meaning of the clause to potential ratifiers of the Constitution: "In a confederacy founded on republican principles, and composed of republican members, the superintending government ought clearly to possess authority to defend the system against aristocratic or monarchical innovations." (Madison, The Federalist, No. 43 (J. Cooke ed. 1961) p. 291.) Obviously, no such innovations are at issue here. Whether the guarantee clause imposes any constraints on federal power, and whether guarantee clause claims are justiciable at all, are still matters the high court has left unsettled. (See *New York v. United States* (1992) 505 U.S. 144, 184–185 [120 L.Ed.2d 120, 112 S.Ct. 2408].)

In making its argument based on these two constitutional provisions, the majority relies a good deal on *Gregory v. Ashcroft* (1991) 501 U.S. 452 [115 L.Ed.2d 410, 111 S.Ct. 2395] (*Gregory*), in which the United States Supreme Court held that the federal Age Discrimination in Employment Act

of 1967 (29 U.S.C. § 621 et seq.; ADEA) did not apply to invalidate a state constitutional provision establishing mandatory retirement for most judges at age 70. The majority cites passages in *Gregory* that refer to the Tenth Amendment and the guarantee clause as presupposing that states possess certain "substantial sovereign powers under our constitutional scheme" (501 U.S. at p. 461), including the power "to determine the qualifications of their most important government officials" (*id.* at p. 463).

But the actual holding in *Gregory* was more modest than is suggested by the majority. The court evoked the "plain statement rule," derived from the Tenth Amendment and the federalist nature of our government, requiring that " '[I]f Congress intends to alter the "usual constitutional balance between the States and the Federal Government," it must make its intention to do so "unmistakably clear in the language of the statute." [Citation.]' " (*Gregory, supra,* 501 U.S. at pp. 460–461.) The court concluded that the determination of qualifications for state officers was traditionally a state prerogative, the alteration of which would require a plain statement from Congress, and that it was ambiguous whether Congress, in exempting appointed state government officials on a "policymaking level" from the ADEA, intended to exempt judges; therefore, the federal act would not override state law. (501 U.S. at pp. 463–467.)

The present case is plainly distinguishable. As stated above, the condition for applying the "plain statement rule" is an alteration of "the 'usual constitutional balance between the States and the Federal Government.' " (*Gregory, supra,* 501 U.S. at pp. 460, 461.) In this case, there is no such alteration. Rather, the Tribe asks for application of the usual rule that Congress alone has exclusive authority to place conditions on tribal sovereignty. There is no need for Congress to affirmatively specify that Indian sovereign immunity applies to suits to enforce state political reform legislation, since the long-standing assumption of Congress and the courts is that such immunity does apply absent congressional restriction.

More fundamentally, the Tenth Amendment, which speaks in terms of power "reserved to the states," gives the states no power to abrogate Indian sovereign immunity, because all such power was ceded to the federal government when the states ratified the Constitution. As noted, the United States Constitution gave Congress plenary authority over Indian affairs. "[B]ecause the power to regulate Indians is one conferred on the federal government, the Tenth Amendment does not reserve such authority to the States." (*Carcieri v. Norton* (D.R.I. 2003) 290 F.Supp.2d 167, 189; see also *City of Roseville v. Norton* (D.D.C. 2002) 219 F.Supp.2d 130, 153–154.) Although the majority distinguishes these cases on their facts, it does not

come to grips with the basic principle to emerge from them: that the Tenth Amendment does not and cannot authorize state control over Indian tribal matters.

Indeed, although *Gregory* suggests that Congress, with a sufficiently plain statement and substantial rationale, could legislate to prevent age discrimination among state judges, the majority's holding goes much further. According to the logic of the majority opinion, even if Congress legislatively affirmed Indian sovereign immunity from suits involving political reporting of contributions to the states, such legislation would be constitutionally invalid. This conclusion contravenes United States Supreme Court case law pertaining to Indian sovereignty and finds no support in Tenth Amendment or guarantee clause jurisprudence.

Furthermore, even the more expansive visions of the Tenth Amendment and the guarantee clause propounded by academic authorities cited by the majority provide little support for its position. For example, Professor Tribe states: "[W]hatever the interpretive difficulties, the text of the Constitution provides a compelling justification for the Court to use Article IV as a basis for marking the outer limits and inviolate spheres of state autonomy. Enforcement of the Guarantee Clause would ensure that Congress would be unable to deny the states *some* symbolic corollaries of independent status; *some* revenue with which to operate; *some* sphere of autonomous lawmaking, law-enforcing, and dispute-resolving competence; and *some* measure of choice in selecting a political and administrative structure." (1 Tribe, American Constitutional Law (3d ed. 2000) § 5-12, p. 910, original italics.)

There is no basis for asserting that the restriction on the state's ability to enforce political reporting requirements at issue here implicates these kinds of basic minimums of state sovereignty. Indeed, in practical terms, it is far from clear why the impairment of the state's ability to enforce political reporting requirements is a greater burden on state sovereignty than the impairment of its ability to collect lawfully owed tax revenue at issue in *Potawatomi Tribe*, or its ability to provide a judicial forum for its citizens aggrieved by tribal actions, as in *Kiowa Tribe* and *Three Affiliated Tribes*. Affirming the principle that tribes possess sovereign immunity that cannot be diminished by the states means, necessarily, that state sovereignty will in some circumstances be correspondingly diminished. To assert that the loss of state sovereignty implicates the Tenth Amendment is a formula for doing away with tribal immunity, and goes considerably beyond what even the academic champions of the Tenth Amendment have suggested.

Even assuming that the Tenth Amendment and the guarantee clause are particularly focused on preserving aspects of state sovereignty having to do

with the most basic attributes of political self-determination, such as the ability of the state to decide the qualifications of its important government officials (*Gregory, supra,* 501 U.S. at p. 463), it is difficult to see how those matters are implicated here. The Indian tribes do not and cannot dictate the qualifications of state officials or any other feature of California governance. Moreover, the Tribe concedes that it is subject to the reporting requirements of the PRA. The FPPC and its amici curiae identify the critical state interest advanced by the reporting requirements as one of ensuring that voters know who is supporting and contributing to the various political candidates and propositions, in order to make better informed voting choices. While the state's interest in ensuring an informed electorate is critical, the denial of the right to sue an Indian tribe to enforce the reporting requirement does not put that interest beyond the state's reach. Although "sovereign immunity bars the State from pursuing the most efficient remedy" (*Potawatomi Tribe, supra,* 498 U.S. at p. 514), the state is not without alternatives. For the most part, the FPPC may obtain the desired information from the campaign contribution reports of those who are the recipients of the Tribe's political contributions or from other public record sources.

Even if the FPPC is unable to obtain such information in every instance, the state has other options. It may pursue an agreement with the Tribe to waive sovereign immunity in matters pertaining to political reporting requirements. The Tribe emphasized at oral argument that it would be willing to enter into such an agreement. Contrary to the majority's view, the incentive of Indian tribes to do so is strong. Growing concern with Indian tribal influence on politics has led to widespread calls for greater tribal accountability. (See Knickerbocker, *More Scrutiny of Indian Casino Plans,* Christian Science Monitor (Feb. 7, 2006), <http://www.csmonitor.com/2006/0207/p02s01-uspo.html> [as of Dec. 21, 2006] [Abramoff scandal has led to proposed reforms of tribal political contribution rules].) A tribe concerned with preserving its own sovereignty while at the same time seeking to maintain good relations with the government and citizens of the state in which it resides may recognize that concessions are necessary to promote its own long-run interests. Moreover, tribal officials acting beyond the scope of their authority may be subject to civil liability. (*Potawatomi Tribe, supra,* 498 U.S. at p. 514; Cohen, Handbook of Federal Indian Law (2005 ed.) § 7.05[1][a], p. 636 (Cohen).)

Finally, California and other similarly situated states concerned with addressing the growing problem of tribal campaign contributions may petition Congress. (*Potawatomi Tribe, supra,* 498 U.S. at p. 514.) The same political pressures that provide the Tribes with incentives to negotiate with the states also point toward congressional action if the current problems are not resolved through other means.

## IV.

The ideal of Indian tribal sovereign immunity and federal protection has existed side by side with the reality of Indians massacred and dispossessed from their land by state and private interests (see, e.g., Heizer, The Destruction of California Indians (1974) pp. vi–ix.), or more recently, of Indians living in poverty as second-class citizens (see generally Cohen, *supra*, §§ 1.04–1.06, pp. 75–97). We have now begun to enter a new era in which tribal economic and political power is growing, and the ideal of tribal sovereignty is becoming more concretely realized. If the doctrine of tribal sovereign immunity needs to be modified to respond to these changes, federal law teaches that it is Congress, not the states, that is constitutionally delegated and historically assigned the task of making that modification, and that it is in a unique position "to weigh and accommodate the competing policy concerns and reliance interests." (*Kiowa Tribe*, *supra*, 523 U.S. at p. 759.)

I would therefore reverse the judgment of the Court of Appeal.

Kennard, J., and Werdegar, J., concurred.

Petitioner's petition for a rehearing was denied February 28, 2007. Kennard, J., Werdegar, J., and Moreno, J., were of the opinion that the petition should be granted.