[No. B203548. Second Dist., Div. Seven. Dec. 15, 2008.]

AMERILOAN et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE ex rel. PRESTON DUFAUCHARD, as Commissioner, etc.,
Real Party in Interest.

82

COUNSEL

Fredericks Peebles & Morgan, John M. Peebles and John Nyhan for Petitioners.

No appearance for Respondent.

Preston Dufauchard, Wayne Strumpfer, Alan S. Weinger and Uche L. Enenwali for Real Party in Interest.

OPINION

**PERLUSS, P. J.**—As a matter of federal law, absent congressional authorization or an Indian tribe's consent to suit, a federally recognized Indian tribe enjoys immunity from any suit in state court, even if the activity that is the subject of the lawsuit is purely commercial in nature or occurs on nontribal lands. (*Kiowa Tribe of Okla. v. Manufacturing Technologies, Inc.* (1998) 523 U.S. 751, 754–755 [140 L.Ed.2d 981, 118 S.Ct. 1700] (*Kiowa*).) That immunity extends to a tribe's for-profit business entities when the entity is operating on behalf of the tribe. (See *Agua Caliente Band of Cahuilla Indians v. Superior Court* (2006) 40 Cal.4th 239, 247–248 [52 Cal.Rptr.3d 659, 148 P.3d 1126] (*Agua Caliente*); *Redding Rancheria v. Superior Court* (2001) 88 Cal.App.4th 384, 388–389 [105 Cal.Rptr.2d 773] (*Rancheria*).)

Five companies providing short-term loans to California residents over the Internet seek a writ of mandate compelling the trial court to vacate its order denying their collective motion to quash service of summons in this action by

California's Department of Corporations (Department) to enforce various provisions of the California Deferred Deposit Transaction Law (DDTL) (Fin. Code, § 23000 et seq.). The companies assert they are business entities wholly owned by federally recognized Indian tribes and thus protected from this state enforcement action under the doctrine of tribal sovereign immunity.

Respondent superior court erroneously concluded that tribal sovereign immunity does not apply to off-reservation commercial activity, that application of the tribal sovereign immunity doctrine in this enforcement action would intrude on California's exercise of state sovereignty protected by the Tenth Amendment to the United States Constitution and that each of the tribes affiliated with the loan companies had affirmatively waived its immunity and consented to be sued in state court. Accordingly, we grant the petition in part, issue the writ and direct the trial court to vacate its order denying the motion to quash and granting the Department's application for a preliminary injunction. However, because the trial court did not address whether the companies, which are not themselves Indian tribes, operate as "arms of the tribe" for purposes of the tribal sovereign immunity doctrine (see, e.g., *Rancheria, supra*, 88 Cal.App.4th at p. 389; *Trudgeon v. Fantasy Springs Casino* (1999) 71 Cal.App.4th 632, 636–637 [84 Cal.Rptr.2d 65] (*Trudgeon*)), we direct the trial court to conduct further proceedings to determine whether the doctrine deprives the court of subject matter jurisdiction in this case.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Initiation of the State Enforcement Action*

Ameriloan, United Cash Loans, US Fast Cash, Preferred Cash and One Click Cash (collectively payday loan companies) provide Internet-based, deferred deposit transactions to California residents, transactions commonly referred to as "payday loans."[1] In June 2007, after its cease and desist orders were ignored, the Department filed suit against the payday loan companies in Los Angeles County Superior Court seeking to enjoin them from doing business with California residents on the ground they were operating in

---

[1] "Payday lenders" offer short-term loans at inflated interest rates typically to consumers with impaired credit histories. "In financial terms, the product is a very short-term, single payment loan, in which the lender extends a loan on one date, in return for a promise (usually evidenced by a postdated check or by automated clearing house (ACH) authorization) to repay the amount of the loan plus a standard fee, typically in the range of $15 to $20 per $100 borrowed. Notably, the amount of the fee is usually fixed, without regard to the number of days that will elapse between the date of the loan and the fixed repayment date, which is normally the expected date of the borrower's next paycheck." (Mann & Hawkins, *Just Until Payday* (2007) 54 UCLA L.Rev. 855, 861–862, fns. omitted.)

violation of various provisions of the DDTL. In addition to preliminary and permanent injunctions, the Department sought civil penalties under the DDTL.

On July 30, 2007 the trial court granted the Department's ex parte request for a temporary restraining order against each of the payday loan companies and set a hearing date of August 10, 2007 for the payday loan companies to show cause why the request for a preliminary injunction should not be granted.

### 2. *The Payday Loan Companies' Motion to Quash and Opposition to the Department's Application for a Preliminary Injunction*

After obtaining a continuance of the hearing on the order to show cause, on August 27, 2007 the Miami Nation Enterprise (MNE), "an economic subdivision" of the Miami Tribe of Oklahoma, a federally recognized Indian tribe organized pursuant to the Oklahoma Welfare Act (25 U.S.C. § 501 et seq.), specially appeared in the action and filed a motion to quash challenging the court's subject matter jurisdiction. MNE claimed Ameriloan, US Fast Cash and United Cash Loans were trade names utilized in its cash advance business and were immune from this state enforcement action under the doctrine of tribal sovereign immunity.

In support of its motion MNE included a copy of the Constitution of the Miami Tribe of Oklahoma, as well as the declaration of Don Brady, the chief executive officer of MNE. According to Brady, MNE was established by the business committee of the Miami Tribe of Oklahoma in May 2005 through resolution No. 05-14 (a copy of which was attached to Brady's declaration) for the purpose of supplying a self-sustaining and diversified stream of revenues for the tribe. Brady declared all profits generated from MNE's cash-advance business are "reinvested in economic and governmental purposes of the Miami tribe to fund critical governmental services to [the tribe's] members, such as tribal law enforcement, poverty assistance, housing, nutrition, preschool, elder care programs, school supplies and scholarships." Brady also testified the cash-advance business is a "critical component" of the Miami Tribe's economy and governmental operations and generated "full-time employment" for approximately 43 of its 3,400 members.

SFS, Inc. (SFS), also specially appeared in the action and filed a joinder in MNE's motion to quash and opposition to the application for a preliminary injunction. According to the declarations accompanying SFS's joinder, One Click Cash and Preferred Cash are trade names utilized by SFS, a corporation

wholly owned by the Santee Sioux Nation (Santee Sioux), a federally recognized Indian tribe organized under the Indian Reorganization Act (25 U.S.C. § 476). Along with its joinder, SFS provided the declaration of Robert Campbell, a member of the Santee Sioux's tribal counsel and treasurer of SFS. Campbell explained SFS was created by the Santee Sioux in March 2005 for the purpose of establishing a business entity to provide short-term loans and cash-advance services and, through the profits achieved in that effort, "facilitat[e] the achievement of goals relating to the Tribal economy, self-government, and sovereign status of the Santee Sioux nation." According to Campbell, "[a]ll profits earned by SFS go to the Santee Sioux to help fund its government operations and social welfare programs."

In opposition to the Department's request for a preliminary injunction, both MNE and SFS contended their businesses, utilizing automated clearing house transactions,[2] were not subject to the provisions of the DDTL, which, by its terms, applies to transactions involving "personal checks."

The Department opposed the motion to quash, arguing the doctrine of tribal sovereign immunity did not apply to the transactions at issue, that is, off-reservation commercial activities. Alternatively, it asserted a finding of tribal sovereign immunity would intrude upon California's exercise of its reserved power under the Tenth Amendment to enforce its consumer protection laws. Finally, the Department insisted MNE and SFS had waived their tribal sovereign immunity by virtue of a "sue and be sued" clause in the resolution creating MNE[3] and by an arbitration clause contained in each of the payday loan companies' customer contracts.[4] The Department also urged at the hearing on the motion that, at the very least, it should be entitled to

---

[2] "Automated Clearing House" is a nationwide batch-oriented electronic funds transfer system overseen by the National Automated Clearing House Association (NACHA). (See <http://www.nacha.org> [as of Dec. 15, 2008].)

[3] The tribal resolution creating MNE includes a "sue and be sued clause": "Miami Nation Enterprises may be sued, in the Tribal Court or in the Court of another jurisdiction in its own name upon any contract or obligation arising out of its activities in such other jurisdiction, and the immunity from suit which it has as a subordinate economic enterprise and political subdivision of the Miami Tribe of Oklahoma due to the doctrine of sovereign immunity is hereby expressly waived pursuant only to the extent of the specific terms of the applicable contract or obligation."

No similar provision appears in the resolution creating SFS.

[4] The payday companies' loan agreements with California residents contain an arbitration clause: "Arbitration of All Disputes. You and we agree that any and all claims, disputes, or controversies between you and us . . . regarding this loan or any other loan you previously or may later obtain from us . . . shall be resolved by binding individual (and not joint) arbitration by and under the Code of Procedure of the National Arbitration Forum. . . . This agreement to arbitrate all disputes shall apply no matter by whom or against whom the claim is filed. . . . Judgment upon the award may be entered by any party in any court having jurisdiction."

conduct discovery to challenge the jurisdictional facts articulated in the declarations accompanying the motions to quash.

### 3. *The Trial Court's Ruling*

The trial court denied the motion to quash on the ground sovereign immunity did not apply as a matter of law, citing each of the reasons articulated in the Department's opposition to the motion. In the same order the court granted the request for a preliminary injunction.[5]

### 4. *The Petition for Writ of Mandate*

On November 13, 2007 the payday loan companies filed a petition for writ of mandate urging this court to vacate the trial court's October 19, 2007 order denying their motion to quash and granting the Department's request for a preliminary injunction. After reviewing and considering the petition, the preliminary opposition filed by the Department and the payday companies' informal reply, we summarily denied the petition on January 24, 2008. On February 4, 2008 the payday loan companies filed a petition for review with the Supreme Court. On March 26, 2008 the Supreme Court granted the petition and transferred the matter to this court with directions to vacate our order denying mandate and to issue an alternative writ to be heard "when the proceeding is ordered on calendar."

Pursuant to the Supreme Court's March 26, 2008 order, on April 17, 2008 we issued an alternative writ of mandate directing the trial court either to vacate its October 19, 2007 order denying the motion to quash and granting the preliminary injunction and make a new and different order granting the motion to quash and denying the motion for a preliminary injunction or to show cause why a peremptory writ of mandate should not issue. The Department filed its return to the alternative writ of mandate on May 23, 2008, and the payday loan companies filed a reply on June 20, 2008.

## CONTENTIONS

The payday loan companies contend the trial court erred in concluding as a matter of law (1) tribal sovereign immunity does not apply to off-reservation commercial transactions involving non-Indians; (2) application of sovereign

---

[5] The trial court's order enjoins the payday loan companies from (1) engaging in unlicensed, nonexempt deferred deposit transaction business in violation of Financial Code section 23005; (2) originating excessive deferred deposit transactions and failing to provide customers with notice in violation of Financial Code section 23035; (3) charging excessive fees in violation of Financial Code section 23036; (4) violating the Department's August 2006 desist and refrain order; and (5) destroying records.

immunity intrudes upon California's reserved powers under the Tenth Amendment to the United States Constitution; and (3) the payday loan companies have waived their immunity to suit. They also contend the court erred in granting the preliminary injunction because the automated clearing house transactions at issue in this case are not subject to the provisions of the DDTL.

## DISCUSSION

### 1. *The Doctrine of Tribal Sovereign Immunity*

"Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." (*Oklahoma Tax Comm'n v. Potawatomi Tribe* (1991) 498 U.S. 505, 509 [112 L.Ed.2d 1112, 111 S.Ct. 905] (*Potawatomi*).) An Indian tribe's sovereign nation status confers an absolute immunity from suit in federal or state court, absent an express waiver of that immunity or congressional authorization to sue. (*Kiowa, supra*, 523 U.S. at p. 754 ["[a]s a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity"]; *Lawrence v. Barona Valley Ranch Resort & Casino* (2007) 153 Cal.App.4th 1364, 1368 [64 Cal.Rptr.3d 23] [state court lacks subject matter jurisdiction in action involving federally recognized Indian tribe].) Because tribal sovereign immunity is a matter of federal law, it "is not subject to diminution by the States." (*Kiowa*, at p. 756; see also *Bryan v. Itasca County* (1976) 426 U.S. 373, 376, fn. 2 [48 L.Ed.2d 710, 96 S.Ct. 2102] [federal government has "plenary and exclusive power . . . to deal with Indian tribes"]; *Lawrence*, at p. 1368.)

### 2. *The Trial Court Erred in Concluding as a Matter of Law That Tribal Sovereign Immunity Does Not Apply to Off-reservation Commercial Conduct*

The doctrine of tribal sovereign immunity is not limited to government-related activity occurring on tribal lands, but also protects the tribe's off-reservation, for-profit commercial conduct. (See *Kiowa, supra*, 523 U.S. at p. 760 ["[t]ribes enjoy immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation"]; see also *id.* at p. 755 ["[t]hough respondent asks us to confine immunity from suit to transactions on reservations and to governmental activities, our precedents have not drawn these distinctions"].) Accordingly, the trial court erred in concluding as a matter of

law that the doctrine of tribal sovereign immunity did not apply to the payday loan companies' off-reservation commercial conduct.[6]

The Department asserts *Kiowa* is inapposite because it involved a private action, not a government-initiated enforcement action, and argues *Mescalero Apache Tribe v. Jones* (1973) 411 U.S. 145, 148–149 [36 L.Ed.2d 114, 93 S.Ct. 1267] (*Mescalero*) and *Kake Village v. Egan* (1962) 369 U.S. 60, 75 [7 L.Ed.2d 573, 82 S.Ct. 562] (*Kake Village*) control this case. The Department misapprehends the relevant case law and confuses principles of preemption with those governing tribal sovereign immunity. *Mescalero* and *Kake Village* involved California's effort to regulate off-reservation commercial conduct of Indian tribes. Both cases addressed whether state law could regulate tribal conduct or whether in that context state regulation was preempted by federal law. In both cases the Supreme Court held the state was permitted to regulate an Indian tribe's commercial activities occurring on nontribal lands within the state. (See *Mescalero*, at pp. 148–149 [state may impose nondiscriminatory gross receipts tax on ski resort operated by Indian tribe on off-reservation land]; *Kake Village*, at p. 75 [state may regulate off-reservation commercial salmon fishing by Indian tribes].)

▮ The question raised in the case at bar, in contrast, is not whether the state is preempted by federal law from regulating tribal commercial activities under the DDTL, but whether the payday loan companies are protected from a government enforcement action under the doctrine of tribal sovereign immunity. As the Supreme Court explained in *Kiowa, supra*, 523 U.S. 751, expressly distinguishing the preemption analysis in *Mescalero, supra*, 411 U.S. 145, and *Kake Village, supra*, 369 U.S. 60, from the question of tribal sovereign immunity, "We have recognized that a State may have authority to tax or regulate tribal activities occurring within the State but outside Indian country. (See *Mescalero*[, at pp. 148–149]; see also [*Kake Village*, at pp. 70–71].) To say substantive state laws apply to off-reservation conduct, however, is not to say that a tribe no longer enjoys immunity from suit. . . . There is a difference between the right to demand compliance with state laws and the means available to enforce them." (*Kiowa*, at p. 755; see also *Potawatomi, supra*, 498 U.S. at p. 510 [although state is not preempted by federal law from taxing or regulating tribal activities occurring within state

---

[6] Absent conflicting extrinsic evidence, the question of jurisdiction is purely one of law subject to de novo review. (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 449 [58 Cal.Rptr.2d 899, 926 P.2d 1085]; *Warburton/Buttner v. Superior Court* (2002) 103 Cal.App.4th 1170, 1180 [127 Cal.Rptr.2d 706] [absent conflicting evidence "the issue of whether a court has subject matter jurisdiction over an action against an Indian tribe is a question of law subject to de novo review"].)

but outside Indian country, tribe enjoys immunity from state enforcement action to collect the unpaid taxes].)

3. *The Trial Court Erred in Ruling Application of Tribal Sovereign Immunity in This Case Would Intrude on California's Exercise of Its Reserved Powers Under the Tenth Amendment*

█ In *Agua Caliente, supra,* 40 Cal.4th at page 261, the California Supreme Court held a state's exercise of its sovereignty in the form of regulating the electoral process is protected under article IV, section 4 (the guarantee clause)[7] and the Tenth Amendment to the United States Constitution[8] and supports a narrow exception to the doctrine of tribal sovereign immunity. Citing *Agua Caliente,* the Department argues application of tribal sovereign immunity in this case would similarly intrude on California's exercise of its reserved powers under the Tenth Amendment. Once again, the Department misconstrues governing case law and fails to recognize the pervasive sweep of the tribal sovereign immunity doctrine.

In *Agua Caliente* the Supreme Court addressed whether the Fair Political Practices Commission could sue the Agua Caliente Band of Cahuilla Indians, a federally recognized Indian tribe, in an enforcement action for violating campaign contribution reporting requirements imposed by the Political Reform Act of 1974 (Gov. Code, § 81000 et seq.). The Indian tribe moved to quash service of summons for lack of jurisdiction, asserting, as a federally recognized Indian tribe, it was immune from suit under the doctrine of tribal sovereign immunity.

The court began its analysis of the immunity issue by recognizing Congress's plenary power to deal with Indian tribes and emphasized the general rule that Indian tribes' sovereign status affords them broad immunity from state jurisdiction. (*Agua Caliente, supra,* 40 Cal.4th at pp. 245, 247.) However, the court found that the "unique circumstances" of the case before it fell outside the realm of congressional plenary power because it implicated the state's right to preserve its republican form of government under the guarantee clause (U.S. Const., art. IV, § 4), as well as its rights reserved under the Tenth Amendment to the United States Constitution. Because tribal members, as citizens of the United States, are allowed to participate in state elections,

---

[7] Article IV, section 4 of the United States Constitution provides, "The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature or the Executive (when the Legislature cannot be convened) against domestic Violence."

[8] The Tenth Amendment to the United States Constitution reserves to the states (or to the people) "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States . . . ."

"[a]llowing the Tribe immunity from suit in this context would allow tribal members to participate in elections and make campaign contributions (using the tribal organization) unfettered by regulations designed to ensure the system's integrity," leaving the state "powerless to effectively guard against political corruption" and putting the state's republican form of government at risk. (*Agua Caliente*, at p. 259.) Given these "unique facts," the court held that the application of tribal immunity would infringe on the state's ability to regulate its electoral process and thus intrude on the rights protected under the guarantee clause and the Tenth Amendment. (*Agua Caliente*, at p. 261.)

In concluding the Fair Political Practices Commission was authorized to bring suit against the tribe to enforce the Political Reform Act, the court was quite careful to limit its holding, observing the circumstances implicating California's electoral process "differ[] substantially from cases concerning application of sovereign immunity involving a tribe's contracts or commercial ventures, its courts and governing bodies, or tribal lands." (*Agua Caliente, supra*, 40 Cal.4th at pp. 260–261.) "[W]e recognize that our abrogation of the sovereign immunity doctrine under these facts is narrow and carefully circumscribed to apply only in cases where California, through its Fair Political Practices Commission, sues an Indian tribe for violations of state fair political practice laws." (*Id.* at p. 261.)

While acknowledging the instant case does not involve an attempt to enforce California's political campaign laws or otherwise directly impact the federal Constitution's guarantee clause, the Department nonetheless urges the Tenth Amendment analysis in *Agua Caliente* should be applied any time a state brings suit to enforce its laws against Indian tribes engaged in commercial activity on nontribal lands. In essence, they argue the state's right to enforce its consumer protection laws is derived from the Tenth Amendment and leaving the state without the right to enforce its own laws violates the Constitution.

Both the United States Supreme Court (see *Kiowa, supra*, 523 U.S. at p. 760; *Potawatomi, supra*, 498 U.S. at p. 514) and the California Supreme Court (see *Agua Caliente, supra*, 40 Cal.4th at pp. 260–261) have cautioned against such a broad abrogation of the doctrine of tribal sovereign immunity. To be sure, it will often be the case that the doctrine of tribal sovereign immunity, if applied, will prevent vindication of important rights, whether those rights are pursued privately or by the state on behalf of its citizens in a government enforcement action. Indeed, the Oklahoma Tax Commission made precisely that argument when it sought to enforce its tax laws against an Indian tribe operating a convenience store. (See *Potawatomi, supra*,

498 U.S. at p. 514 [Oklahoma Tax Commission argued allowing tribe to assert immunity from suit would give Oklahoma a right to tax the tribes for certain conduct without a remedy to enforce it].) The Supreme Court, however, was unpersuaded. "There is no doubt that sovereign immunity bars the State from pursuing the most efficient remedy [enforcement of its tax laws via a state enforcement action], but we are not persuaded that [the state] lacks any adequate alternatives. . . . [Most fundamentally, the state] may of course seek appropriate legislation from Congress." (*Ibid.*; accord, *Kiowa*, at p. 755 ["[i]n *Potawatomi*, for example, we reaffirmed that while Oklahoma may tax cigarette sales by a Tribe's store to nonmembers, the Tribe enjoys immunity from a suit to collect unpaid state taxes"].)

█ The Department suggests, because payday loan companies prey on those unable to obtain credit elsewhere, their violations of the DDTL harm a particularly vulnerable part of the population. It urges that, at the very least, the equities weigh against applying tribal sovereign immunity in a state's action to enforce its consumer protection laws, lest the harm continue unregulated and unabated. We recognize the issues of fairness presented and are not unsympathetic to the Department's policy argument. But " 'sovereign immunity is not a discretionary doctrine that may be applied as a remedy depending on the equities of a given situation . . . .' Rather it presents a pure jurisdictional question." (*Warburton/Buttner v. Superior Court, supra*, 103 Cal.App.4th at p. 1182, citations omitted.)

█ Certainly, as Indian tribes operate in an increasingly commercial climate affecting large numbers of consumers, the justification for a broad doctrine of tribal sovereign immunity can be called into question: "At one time, the doctrine of tribal immunity from suit might have been thought necessary to protect nascent tribal governments from encroachments by States. In our interdependent and mobile society, however, tribal immunity extends beyond what is needed to safeguard tribal self-governance. This is evident when tribes take part in the Nation's commerce. Tribal enterprises now include ski resorts, gambling, and sales of cigarettes to non-Indians. [Citations.] In this economic context, immunity can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims." (*Kiowa, supra*, 523 U.S. at p. 758; see also *Agua Caliente, supra*, 40 Cal.4th at p. 252.) Nonetheless, as the United States Supreme Court has repeatedly made clear in reaffirming the doctrine, Congress, not the courts, is empowered to weigh and accommodate the competing policy concerns and interests to determine whether and under what circumstances to dispense with the doctrine. (*Kiowa*, at p. 760; see *Potawatomi, supra*, 498 U.S. at p. 514; see also *Cook v. Avi Casino Enterprises, Inc.* (2008) 548 F.3d 718, 727 (conc. opn. of Gould, J.) ["the austerity of our jurisprudence concerning tribal

sovereign immunity leaves me with the conclusion that an unjust result is reached that our law might better preclude"].)

### 4. *The Trial Court Erred in Concluding Tribal Sovereign Immunity Has Been Waived*

■ A tribe may waive its tribal sovereign immunity, thus conferring subject matter jurisdiction on the state court. (*C & L Enterprises, Inc. v. Citizen Band Potawatomi Tribe of Okla.* (2001) 532 U.S. 411, 418 [149 L.Ed.2d 623, 121 S.Ct. 1589] (*C&L Enterprises*); *Kiowa, supra*, 523 U.S. at p. 754.) To constitute an effective relinquishment of the right to immunity, the waiver must be " 'clear.' " (*C&L Enterprises*, at p. 418; *Lawrence v. Barona Valley Ranch Resort & Casino, supra*, 153 Cal.App.4th at p. 1369; see also *Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 58 [56 L.Ed.2d 106, 98 S.Ct. 1670, 1677] ["[i]t is settled that a waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed' "].) Waivers in this context are " 'strictly construed' [citation] and there is a 'strong presumption' against them. [Citation.] 'Because a waiver of immunity " 'is altogether voluntary on the part of [a tribe], it follows that [a tribe] may prescribe the terms and conditions on which it consents to be sued, and the manner in which the suit shall be conducted.' " ' " (*Big Valley Band of Pomo Indians v. Superior Court* (2005) 133 Cal.App.4th 1185, 1193 [35 Cal.Rptr.3d 357]; see also *World Wide Minerals v. Republic of Kazakhstan* (D.C. Cir. 2002) 353 U.S. App.D.C. 147 [296 F.3d 1154, 1162] ["waivers of sovereign immunity are narrowly construed 'in favor of the sovereign' and are not enlarged 'beyond what the language requires' "].)

The Department advances two bases to support a finding of waiver: First, it identifies the "sue or be sued" clause in the resolution establishing MNE as an economic subdivision of the Miami Tribe of Oklahoma. Second, it cites the arbitration provision contained in each of the payday loan companies' loan agreements with consumers. Neither of these provisions is sufficient to find a clear waiver of a tribe's sovereign immunity in the present enforcement action.

The "sue or be sued" clause in the resolution establishing MNE provides MNE "may be sued in the Tribal Court or in the Court of another jurisdiction . . . upon any contract or obligation arising out of its activities in such jurisdiction . . . ." That "sue or be sued provision," standing alone, may in fact constitute a waiver of tribal sovereign immunity for entities created by virtue of the resolution. (See, e.g., *Namekagon Develop. Co. v. Bois Forte Res. Hous. Auth.* (8th Cir. 1975) 517 F.2d 508, 510 ["[I]t is indisputable [by virtue of the 'sue and be sued clause'] that the tribe waived, at least to some extent, the Authority's right to be free from suit. [Fn. omitted.] The question is the

extent to which that immunity was waived."]; *Cook v. Avi Casino Enterprises, Inc., supra*, 548 F.3d at p. 726, fn. 6 ["the issue whether a 'sue and be sued' clause in a tribe's enabling ordinance effectuates a waiver of tribal sovereign immunity remains a live issue for determination in this circuit"]; see generally Cohen, Handbook of Federal Indian Law (2007) § 4.04[3][a][ii] ["some courts have held this language to be a waiver of the immunity of the tribal corporation, and others have not"].) The argument for waiver is that, by expressly authorizing suits based on "obligation[s] arising out of its activities in other jurisdictions," the tribe has consented to actions to enforce liabilities created not only by negotiation, but also by virtue of MNE's conduct.

However, the resolution creating MNE goes on to state "the immunity from suit which [MNE] has as a subordinate economic enterprise and political subdivision of the Miami Tribe of Oklahoma due to the doctrine of sovereign immunity is hereby expressly waived pursuant only to the extent of the specific terms of the applicable contract or obligation." This additional language in the "sue or be sued" clause plainly limits the scope of the waiver to the terms provided in the applicable contract or obligation that is the subject of the suit. (See, e.g., *Big Valley Band of Pomo Indians v. Superior Court, supra*, 133 Cal.App.4th at pp. 1194–1195 [waivers of sovereign immunity are limited to what the language requires].)

Alternatively, the Department argues each of the payday loan companies' loan agreements with consumers contains an arbitration clause providing any dispute regarding any loan obtained from the respective payday loan companies "shall be resolved by binding individual (and not joint) arbitration . . . . This agreement to arbitrate all disputes shall apply no matter by whom or against whom the claim is filed. . . . Judgment upon the award may be entered by any party in any court having jurisdiction." Citing *C&L Enterprises, supra*, 532 U.S. 411, the Department asserts this mandatory arbitration clause in agreements between California consumers and the payday loan companies constitutes an express waiver of immunity for all purposes. *C&L Enterprises* does not stand for the broad proposition asserted by the Department.

In *C&L Enterprises, supra*, 532 U.S. 411, a construction company entered into a contract with a federally recognized Indian tribe to make improvements to nontribal property. The agreement contained an arbitration clause requiring all disputes to be decided by arbitration in accordance with the "Construction Industry Arbitration rules of the American Arbitration Association." The American Arbitration Association Rules provide, " 'Parties to these rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof.' " (*Id.* at p. 415.) After a dispute arose, the construction company submitted an

arbitration demand. The tribe asserted sovereign immunity and declined to participate in the arbitration proceeding, but notified the arbitrator it had several substantive defenses. The arbitrator rendered an award in favor of the construction company. When the construction company filed suit to enforce the award, the tribe moved to dismiss on the ground of tribal sovereign immunity. The Supreme Court held the arbitration clause constituted a clear and express waiver of sovereign immunity as a defense to an arbitration action and to enforcement of an arbitration award. (*Id.* at pp. 422–423.)

Because *C&L Enterprises* involved an action to enforce an arbitration award, the court did not consider whether the immunity waiver extended beyond actions to compel arbitration or enforce an award. (See *Big Valley Band of Pomo Indians v. Superior Court, supra,* 133 Cal.App.4th at p. 1194, fn. 6 [the court in *C&L Enterprises* was "careful to describe the effect of the arbitration clause as limited to a consent to arbitrate and enforce any award in state court"]; see also *id.* at p. 1194 [the analysis in *C&L Enteprises* does not suggest that acceptance of an arbitration clause constitutes a broader immunity waiver].) The argument an arbitration clause effectuates a waiver of tribal sovereign immunity as to all state court claims, however, was squarely considered in *Big Valley Band of Pomo Indians, supra,* 133 Cal.App.4th 1185. The Court of Appeal, in an opinion by Justice Corrigan, held an arbitration clause in an employment contract with employees of a casino owned by a federally recognized Indian tribe provided only a limited waiver of sovereign immunity for an action to enforce an arbitration award, not a waiver applicable to a breach of contract action filed in state court. (*Id.* at p. 1194 ["The arbitration clauses here do not effect a general waiver of the Tribe's sovereign immunity even though the clauses are not explicitly self-limiting. They are insufficient to waive immunity from a breach of contract action. At most they indicate an arbitration award may be entered in a court of competent jurisdiction."].)

In the instant matter, at most the arbitration clause effects a waiver of immunity in a suit brought in an arbitral forum by a party to the contract. Thus, even if the Department could advance a compelling argument that it somehow stood in the shoes of the consumer in bringing this action and could be considered a party to the loan contract, and entitled to enforce its arbitration provision, the waiver itself would encompass only a consent to be sued in an arbitral forum or in a forum to enforce an arbitration award, not in an enforcement action filed in state court. Accordingly, the trial court's alternative ruling that the payday loan companies have waived their tribal sovereignty was error.

5. *To Decide the Motion to Quash, the Trial Court Must Find Whether the Payday Loan Companies Act on Behalf of Federally Recognized Indian Tribes*

Although for the reasons discussed we issue a writ of mandate directing the trial court to vacate its October 19, 2007 order denying the payday loan companies' motion to quash, on the record before us we are unable to direct the trial court to enter a new order granting the motion. To properly decide whether the payday loan companies are entitled to the benefits of tribal sovereign immunity, the trial court must first determine whether those entities, in fact, are acting on behalf of federally recognized Indian tribes.

■ Tribal sovereign immunity extends not only to the Indian tribes themselves but also to those for-profit commercial entities that function as "arms of the tribes." (See, e.g., *Rancheria, supra,* 88 Cal.App.4th at pp. 388–389 [off-reservation casino owned and operated by tribal entity was "arm of tribe" and therefore entitled to sovereign immunity]; *Trudgeon, supra,* 71 Cal.App.4th at pp. 638–640 [for-profit corporation formed by tribe to operate tribe's casino functioned on tribe's behalf and therefore immune from suit in state court under tribal sovereign immunity].) The doctrine, however, does not " 'cover tribally chartered corporations that are completely independent of the tribe.' " (*Agua Caliente, supra,* 40 Cal.4th at pp. 247–248; see also Cohen, Handbook of Federal Indian Law, *supra,* § 7.05[1][a] ["[a]lthough the immunity extends to entities that are arms of the tribes, it apparently does not cover tribally chartered corporations that are completely independent of the tribe" (fns. omitted)]; *Trudgeon,* at p. 639 ["[I]t is possible to imagine situations in which a tribal entity may engage in activities which are so far removed from tribal interests that it no longer can legitimately be seen as an extension of the tribe itself. Such an entity arguably should not be immune, notwithstanding the fact it is organized and owned by the tribe."].)

The Department urges us to consider evidence—obtained after the petition for writ of mandate was filed in this action—that it insists shows the payday loan companies' alleged tribal associations are "a sham," part of a "rent-a-tribe" scheme designed to immunize their flagrant violations of the DDTL. The Department asserts it only learned of the evidence in the months after the hearing in the trial court. For their part, the payday loan companies, in motions to strike the evidence and oppositions to the Department's requests for judicial notice of the evidence, urge us not to consider the evidence because it was not before the trial court. They argue that the only evidence before the trial court—the declarations filed in connection with their motion to quash—provide undisputed support for their assertions that they are closely connected to their respective tribes.

We need not and do not consider the Department's "new" evidence in the first instance.[9] In light of the trial court's failure to make findings in this area, we remand the matter to the trial court to consider, after a hearing in which both sides may present all available relevant evidence, whether the entities are sufficiently related to the tribe to benefit from the application of sovereign immunity. (See *Warburton/Buttner v. Superior Court, supra,* 103 Cal.App.4th at p. 1181 [trial court faced with a claim of sovereign immunity may engage in limited but sufficient pretrial factual and legal determinations to satisfy itself on its authority to hear case].) To this end, the court should consider the criteria expressed by the Courts of Appeal in *Trudgeon, supra,* 71 Cal.App.4th at page 638, and *Rancheria, supra,* 88 Cal.App.4th at page 389, including whether the tribe and the entities are closely linked in governing structure and characteristics and whether federal policies intended to promote Indian tribal autonomy are furthered by extension of immunity to the business entity. (See also *Allen v. Gold Country Casino* (9th Cir. 2006) 464 F.3d 1044, 1046 [the relevant question for purposes of applying tribal sovereign immunity "is not whether the activity may be characterized as a business, which is irrelevant under *Kiowa,* but whether the entity acts as an arm of the tribe so that its activities are properly deemed to be those of the tribe"].)[10]

The Department urges, if further proceedings on this issue occur in the trial court, it should have an opportunity to conduct discovery into the payday loan companies' assertions that the profits from the payday loan companies' operations benefit the tribes. It explains it has not yet conducted discovery because, as specially appearing parties, the payday loan companies have had no obligation to respond to discovery requests. Whatever the Department's reasons may have been for not conducting discovery, we see no reason why limited discovery, directed solely to matters affecting the trial court's subject matter jurisdiction, should impact the payday loan companies' special appearance in this action. (See *1880 Corp. v. Superior Court* (1962) 57 Cal.2d 840, 843 [22 Cal.Rptr. 209, 371 P.2d 985] [party challenging court's subject matter jurisdiction may be compelled to respond to limited interrogatories directed to that question without resulting in its general appearance in case]; *Islamic Republic of Iran v. Pahlavi* (1984) 160 Cal.App.3d 620, 628–629 [206 Cal.Rptr. 752] [defendant's participation in limited discovery to support its motion to quash did not result in general appearance].) Nonetheless, because

---

[9] We deny the Department's motions for factual determinations on appeal, for production of additional evidence and for judicial notice. We also grant the payday loan companies' motion to strike exhibits 4, 4a and 5 to the return to the alternative writ of mandate, which contain additional material arguably relevant to this factual question.

[10] It may be that entities engaged in Indian gaming may benefit from tribal sovereign immunity, while payday loan companies marginally affiliated with tribes should not. Although federal law, for example, recognizes the Indian gaming industry is closely connected to the welfare of Indian tribes (see, e.g., 25 U.S.C. § 2701), no similar congressional declaration exists in connection with the payday loan industry.

the trial court did not resolve any discovery questions and none was addressed in the petition for writ of mandate, the issue is not properly before us now. (See *Rangel v. Interinsurance Exchange* (1992) 4 Cal.4th 1, 7, fn. 5 [14 Cal.Rptr.2d 783, 842 P.2d 82].)

> 6. *In Light of the Uncertainty as to the Court's Subject Matter Jurisdiction, Any Resolution of the Applicability of the DDTL to the Transactions at Issue Is Premature*

The payday loan companies argue, whether or not they enjoy immunity from suit, a preliminary injunction in this case is improper because the transactions at issue utilize an automated clearing house to complete an electronic transfer of funds.[11] Accordingly, they assert, their activities are not subject to the provisions of the DDTL, which, by its express terms, applies only to transactions involving the deferred deposit of a customer's "personal check." (See Fin. Code, § 23001, subd. (a) [" '[d]eferred deposit transaction' means a transaction whereby a person defers depositing a customer's personal check until a specific date, pursuant to a written agreement for a fee or other charge, as provided in [Fin. Code], [§] 23035"].) In support of their argument, the payday loan companies assert (without any evidentiary support) that, when the DDTL was enacted in 2002, and certainly by the time it was amended in 2004, automated clearing house transactions had become relatively commonplace, yet the Legislature did not include those transactions within the express provisions of the DDTL. (See *Central Pathology Service Medical Clinic, Inc. v. Superior Court* (1992) 3 Cal.4th 181, 186–187 [10 Cal.Rptr.2d 208, 832 P.2d 924] [legislative intent determined first by reference to statutory language used; if necessary to resolve ambiguity, legislative intent may be distilled from legislative history and wider historical circumstances of its enactment].)[12]

■ The Department, on the other hand, insists deferred deposit transactions utilizing an automated clearing house are the functional equivalent of deferred deposit transactions utilizing a personal check. They argue the DDTL was intended to cover deferred deposit transactions, whether effected through a written instrument or electronic means, and that any other interpretation would violate the spirit of the DDTL and lead to absurd results. (See *California School Employees Assn. v. Governing Board* (1994) 8 Cal.4th 333,

---

[11] See footnote 2, *ante.*

[12] The payday loan companies do not argue the transactions are not subject to any regulation, just that they do not fall within the provisions of the DDTL. They contend their business is regulated by the federal Electronic Fund Transfer Act (15 U.S.C. § 1693 et seq.). Notably they do not assert the state is preempted under federal law from enacting laws in this area. They simply argue that, to date, California has elected not to regulate deferred deposit transactions utilizing automated clearing house electronic transfers.

340 [33 Cal.Rptr.2d 109, 878 P.2d 1321] ["Ordinarily, if the statutory language is clear and unambiguous, there is no need for judicial construction. [Citation.] Nonetheless, a court may determine whether the literal meaning of a statute comports with its purpose. [Citation.] We need not follow the plain meaning of a statute when to do so would 'frustrate[] the manifest purposes of the legislation as a whole or [lead] to absurd results.' "]; see *Doe v. Luster* (2006) 145 Cal.App.4th 139, 147 [51 Cal.Rptr.3d 403].) The Department also observes civil statutes intended for the protection of the public are generally " 'broadly construed in favor of that protective purpose.' " (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 92 [45 Cal.Rptr.3d 394, 137 P.3d 218]; see *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 313 [58 Cal.Rptr.2d 855, 926 P.2d 1042].)

Both sides present substantial arguments. The literal language of the DDTL does not include automated clearing house transactions, yet it is difficult to conjure any valid policy reason for excluding consumers who obtain Internet-based payday loans from the protections afforded by the law. The ideal result, of course, would be for the Legislature to resolve any ambiguity by clarifying its intent concerning the DDTL's applicability to automated clearing house transactions. (See *Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 907 [80 Cal.Rptr.3d 690, 188 P.3d 629] (conc. opn. of Werdegar, J.) ["I urge the Legislature to revisit this statute and if, as I suspect, it intended to create only a requirement that complainants exhaust their internal remedies, to amend the statute in a manner that makes that intent clear."].) Absent further legislative action, of course, it is the courts' responsibility to interpret the DDTL. However, in light of the significant uncertainty whether subject matter jurisdiction exists, any decision concerning the applicability of the DDTL to the transactions at issue in this case would be premature.

## DISPOSITION

The petition is granted in part and denied in part. Let a peremptory writ of mandate issue directing the trial court to vacate its order of October 19, 2007 denying the motion to quash service of summons and granting the preliminary injunction, conduct a new evidentiary hearing to determine whether petitioners Ameriloan, United Cash Loans, US Fast Cash, Preferred Cash and One Click Cash are sufficiently related to federally recognized Indian tribes to be entitled to the benefit of the doctrine of tribal sovereign immunity and conduct any further proceedings not inconsistent with this opinion.

Petitioners Ameriloan, United Cash Loans, US Fast Cash, Preferred Cash and One Click Cash are to recover their costs in this writ proceeding.

Woods, J., and Zelon, J., concurred.

On January 14, 2009, the opinion was modified to read as printed above.