Filed 6/4/24  Tule Lake Com. v. Follis CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Modoc)

----

| | |
|---|---|
| TULE LAKE COMMITTEE, | C098505 |
| Plaintiff and Appellant, | (Super. Ct. No. CU20127) |
| v. | |
| BILL FOLLIS et al., | |
| Defendants and Respondents. | |

Tule Lake Committee (Committee) is an organization dedicated to representing the survivors and descendants of thousands of Japanese Americans imprisoned by the federal government near the California-Oregon border during World War II.[1]  In 2018, the Modoc Nation, a federally recognized Indian tribe formerly known as the Modoc

---

[1]  See Tule Lake National Monument (U.S. National Park Service) (2024) <https://www.nps.gov/tule/index.htm> [as of June 4, 2024], archived at <https://perma.cc/F62S-UZYP>.

Tribe of Oklahoma (Nation), purchased the Tulelake Municipal Airport (airport) from the City of Tulelake and its city council (City). Noting the historical significance of the site and alleging violations of both federal law and California's open meeting laws (the Ralph M. Brown Act (Gov. Code, § 54950 et seq.) (Brown Act)), the Committee brought suit seeking to void the sale. Nation contends it purchased the airport in order to reestablish ownership of its ancestral lands after a 19th-century forced removal from the area surrounding Tule Lake. Like the trial court, we also note that the disputed property has historical and cultural significance for both the Committee and Nation.

The Committee appeals the trial court's ruling dismissing with prejudice its lawsuit against the City, Nation, and Nation officials (collectively, respondents), as barred by the doctrine of tribal sovereign immunity. Because we conclude that the doctrine of tribal sovereign immunity applies here, we affirm.

BACKGROUND

In July 2018, Nation purchased the airport from the City for $17,500 pursuant to a written contract. In October 2020, the Committee filed a civil action against respondents in the superior court challenging the purchase. The complaint's first cause of action challenged the transaction under federal law, arguing that because the City owned the airport pursuant to a federal grant of land made under the Federal Airport Act of 1946, the City could not sell the airport to the Nation. The second cause of action argued the City violated the Brown Act by discussing the airport sale in closed sessions of the city council, and sought prospective relief to prevent future Brown Act violations by the City. The third cause of action sought to void the sale because of Brown Act violations.

Nation moved to quash service of process and to dismiss the complaint, arguing it was both immune from suit under the doctrine of tribal sovereign immunity and an indispensable party to the action. In a March 2023 ruling, the trial court agreed with Nation, explaining (1) tribes have sovereign immunity from lawsuits unless a tribe has waived immunity or Congress has abrogated tribal immunity, (2) the current state of the

2

law does not recognize an exception to tribal sovereign immunity in "immovable property cases," (3) the trial court was disinclined to make such an exception in this matter, and (4) Nation, as owner of the airport, was an indispensable party under section 389 of the Code of Civil Procedure,[2] and therefore the entire action was barred. The Committee timely appealed.

## DISCUSSION

## I

### *Tribal Sovereign Immunity Applies*

A.    *Decisions of the California Supreme Court*

As a general rule, native Indian tribes recognized by the federal government are immune from state court jurisdiction. Immunity extends to entities that are arms of the tribes but does not extend to tribally chartered corporations that are completely independent of the tribe or to tribal officials acting outside the bounds of their lawful authority. Nor does it extend to members of the tribe just because of their status as members. The doctrine of tribal sovereign immunity is a creature of federal common law. (*Agua Caliente Band of Cahuilla Indians v. Superior Court* (2006) 40 Cal.4th 239, 247-248, 259 (*Agua Caliente*).)

The doctrine—which "applies in both federal and state court and extends to 'suits arising from a tribe's commercial activities, even when they take place off Indian lands' "—is a " 'necessary corollary to Indian sovereignty *and* self-governance' " that "rests on two distinct rationales": (1) the sovereign status of tribes and (2) the policy goal of promoting tribal self-governance by minimizing the " 'serious financial burdens' " that lawsuits might impose on already financially disadvantaged tribes. (*People v. Miami Nation Enterprises* (2016) 2 Cal.5th 222, 235.)

---

[2]  Undesignated statutory references are to the Code of Civil Procedure.

3

In *Agua Caliente*, our Supreme Court explained that, in *Kiowa Tribe of Okla. v. Manufacturing Technologies, Inc.* (1998) 523 U.S. 751, "the high court addressed the issue whether recognized Indian tribes enjoy immunity from suit on contracts, regardless of whether those contracts were made on or off a reservation or involved governmental or commercial activities" (*Agua Caliente, supra*, 40 Cal.4th at p. 250), and "held that as 'a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity' " (*id.* at p. 251). Application of the doctrine of tribal sovereign immunity in the economic context "can harm those who . . . have no choice in the matter," our Supreme Court observed. (*Id.* at p. 252.) And while that observation " 'might suggest a need to abrogate tribal immunity,' " the United States Supreme Court in *Kiowa Tribe*—recognizing that Congress *has* "restricted immunity in limited circumstances, including liability insurance and gaming activities"— decided to defer to Congress on the issue. (*Id.* at pp. 251-252.)

But courts need not *always* defer to Congress on questions of tribal sovereign immunity. In *Agua Caliente*, our Supreme Court created a very narrow exception to the general rule of tribal sovereign immunity, holding a tribe was *not* immune from a lawsuit filed by California's Fair Political Practices Commission for failure to comply with campaign contribution reporting requirements under state law. The court explained that the interplay of two provisions of the United States Constitution—the "guarantee clause" of article IV, section 4 (" 'The United States shall guarantee to every State in this Union a Republican Form of Government' ") and the Tenth Amendment (" 'The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people' ")—permitted the lawsuit. (*Agua Caliente, supra*, 40 Cal.4th at pp. 244-245, 259-261.) This was so because the state law that the Fair Political Practices Commission sought to judicially enforce was vitally important to preserving the integrity of California's democratic system of governance, making the matter substantially different "from cases concerning application of sovereign

4

immunity involving a tribe's contracts or commercial ventures, its courts and governing bodies, or tribal lands." (*Id.* at pp. 260-261.)

Though a three-Justice dissent criticized this creation of an exception to the doctrine of tribal sovereign immunity as unsupported by United States Supreme Court precedent (*Agua Caliente, supra*, 40 Cal.4th at pp. 261-262 (dis. opn. of Moreno, J.)),[3] the majority opinion emphasized the exception was "narrow and carefully circumscribed to apply only in cases where California, through its Fair Political Practices Commission, sues an Indian tribe for violations of state fair political practice laws" (*id.* at p. 261), an unmistakably noncommercial context.

B.      *Upper Skagit*

In 2018, the United States Supreme Court vacated a state court ruling that rejected a claim of tribal sovereign immunity. (*Upper Skagit Indian Tribe v. Lundgren* (2018) 584 U.S. 554 (*Upper Skagit*).) After a tribe bought land, it commissioned a survey of the plot to confirm property boundaries. The survey revealed that a barbed wire fence that ostensibly followed the boundary separating the tribe's land from land owned by its neighbors appeared to leave about an acre of the land the tribe had purchased on the neighbors' side. The tribe "informed its new neighbors that it intended to tear down the fence; clearcut the intervening acre; and build a new fence in the right spot. [¶] In response, the [neighbors] filed [a] quiet title action in Washington state court," which led to the Supreme Court of Washington's rejection of the tribe's claim of immunity on grounds that "sovereign immunity does not apply to cases where a judge 'exercis[es] in rem jurisdiction' to quiet title in a parcel of land owned by a [t]ribe." (*Id.* at pp. 556-557.)

---

[3] The dissent acknowledged the majority's "highly desirable objective." (*Agua Caliente, supra*, 40 Cal.4th at pp. 261-262 (dis. opn. of Moreno, J.).)

5

The high court vacated the decision because, in rejecting the tribe's invocation of tribal sovereign immunity, the Washington court incorrectly relied on United States Supreme Court case law that "did not address the scope of tribal sovereign immunity," but addressed only the "much more prosaic question" of interpretation of federal legislation. (*Upper Skagit, supra*, 584 U.S. at p. 558.) Acknowledging that it could adjudicate the merits of the issue whether the doctrine of tribal sovereign immunity applies to "immovable property" owned by a tribe but located off the tribe's reservation, the high court declined to do so. The majority explained: "Determining the limits on the sovereign immunity held by Indian tribes is a grave question," the contours of which "did not emerge until late in th[e] case," after the tribe filed its opening brief. (*Id.* at pp. 559-560.)

In a concurring opinion that Justice Kennedy joined, Chief Justice Roberts explained that while he did "not object to the Court's determination to forgo consideration of the immovable-property rule," he suspected the question might "need to be addressed in a future case" because the "consequences of the Court's decision . . . seem intolerable." (*Upper Skagit, supra*, 584 U.S. at p. 563 (conc. opn. of Roberts, C.J.).) "What precisely is someone in the [tribe's neighbors'] position supposed to do? There should be a means of resolving a mundane dispute over property ownership, even when one of the parties to the dispute—involving non-trust, non-reservation land—is an Indian tribe. The correct answer cannot be that the tribe always wins no matter what; otherwise a tribe could wield sovereign immunity as a sword and seize property with impunity, even without a colorable claim of right." (*Id.* at p. 562 (conc. opn. of Roberts, C.J.).)

In a dissenting opinion joined by Justice Alito, Justice Thomas argued the court "easily" could have resolved the merits of the immovable property exception in the tribal immunity context. "That exception is settled, longstanding, and obviously applies to

6

tribal immunity—as it does to every other type of sovereign immunity that has ever been recognized." (*Upper Skagit, supra*, 584 U.S. at p. 564 (dis. opn. of Thomas, J.).)

C. *Analysis*

The Committee argues there is no support for the proposition that the doctrine of tribal sovereign immunity can "insulate" the airport sale here. If the proposition did exist, the Committee warns, "then any Indian tribe anywhere could defy all regulation of property . . . and cause untold mischief, simply by purchasing it." Urging us to recognize an immovable property exception to the doctrine of tribal sovereign immunity, the Committee contends the majority opinion in *Upper Skagit* "does not reject" such an exception, and that if the reasoning of the dissent is followed, the doctrine would "have no application to a dispute related to a tribe's purchase of off-reservation property." Indeed, the Committee continues, "the entire concept of tribal sovereign immunity may be jettisoned" when the issue next arises at the United States Supreme Court, as the composition of the high court is now "decidedly in the Thomas/Alito camp."

Nation argues a litigant's belief that the United States Supreme Court "may depart from decades of stare decisis does not justify this [c]ourt overstepping clear boundaries" the high court has set for recognizing exceptions to tribal sovereign immunity that Congress has not authorized. Indeed, Nation contends, "Congress, not the courts, delineate[ ] the parameters . . . of tribal sovereign immunity," and "all levels of the judiciary must defer to Congress on the scope of . . . tribal sovereign immunity from suit."

On de novo review (*People v. Miami Nation Enterprises, supra*, 2 Cal.5th at p. 250), we conclude the parties fail to appreciate the import of *Agua Caliente* and *Miami Nation*, cases in which our Supreme Court has made clear that the doctrine of tribal sovereign immunity applies to suits arising from a tribe's off-reservation contractual and

7

commercial activities.[4]  (See *Agua Caliente, supra*, 40 Cal.4th at pp. 250-252, 260-261 [tribal sovereign immunity applies to lawsuits concerning a tribe's off-reservation contracts or commercial ventures even though application of the doctrine can harm those who have no choice in the matter]; *Miami Nation Enterprises,* at p. 235 [the doctrine applies to suits arising from a tribe's commercial activities, even when they take place off Indian lands, in part because forcing tribes to defend themselves in lawsuits could impose serious financial costs, thereby undermining the goal of promoting tribal self-governance through economic development and self-sufficiency].)

The purchase of an airport by means of a written contract is clearly a commercial or contractual activity.  Thus, Nation is immune from any lawsuit arising from its purchase of the airport from the City.  As the Committee's lawsuit against Nation seeks to void the purchase, the doctrine of sovereign immunity applies here.

That a minority of four members of the high court in *Upper Skagit* clearly expressed different levels of concern with application of the doctrine of tribal sovereign immunity in an off-reservation immovable property case does not give us license to create an immovable property exception in the commercial/contractual context of the present case, as that would break with our Supreme Court's decisions.  Relatedly, we may not anticipate a decision by the high court that would put our Supreme Court's jurisprudence in doubt.  (See *Truly Nolen of America v. Superior Court* (2012) 208 Cal.App.4th 487, 507 [agreeing with a party that an opinion of the United States Supreme Court "implicitly disapproved the reasoning" of a California Supreme Court decision, but

---

[4] *Agua Caliente* stands, in part, for the proposition that California courts may occasionally have a role in shaping the boundaries of the doctrine of tribal sovereign immunity, at least when it comes to preserving the integrity of our state's democratic system of governance.  (*Agua Caliente, supra*, 40 Cal.4th at pp. 259-261; see *Lawrence v. Barona Valley Ranch Resort & Casino* (2007) 153 Cal.App.4th 1364, 1370 ["Unlike *Agua Caliente*, this action does not involve a state's attempts to enforce its laws governing political processes"].)

holding that because the high court "did not directly address the precise issue presented in" the California decision, the appellate court would not "disregard" the California decision].)  And that a decision of the Supreme Court of a sister state might support creation of an immovable property exception to tribal immunity is immaterial.

The Committee's reliance on *Self v. Cher-Ae Heights Indian Community of Trinidad Rancheria* (2021) 60 Cal.App.5th 209 (*Self*) in support of its argument that we should create an immovable property exception is unavailing.  In that case, a panel of the First District ruled the doctrine of tribal sovereign immunity bars a quiet title action to establish a public easement for coastal access on property owned by an Indian tribe.  (*Id.* at p. 212.)  The majority opinion noted that (1) on appeal, plaintiffs in the quiet title action did not persuasively explain why the appellate court *should* create an immovable property exception to the doctrine of tribal sovereign immunity (*id.* at p. 218) and (2) the facts of the case made it a poor vehicle for taking the immovable property exception present in the related doctrine of *state* sovereign immunity and extending that exception to the doctrine of *tribal* sovereign immunity (*id.* at p. 221; see *id.* at p. 216).[5]  A concurring opinion expressed the view that the doctrine of tribal sovereign immunity "*does* contain such an exception,"[6] as demonstrated by Justice Thomas's dissent in *Upper*

---

[5]  The majority opinion explained that in *State of Georgia v. Chattanooga* (1924) 264 U.S. 472, 479-480, the high court held that when a state purchases real property in another state, it is not immune to suit over rights to the property.  The majority opinion went on to observe that the high court has " 'often noted . . . that the immunity possessed by Indian tribes is not coextensive with that of the States,' " and that observation undergirded the appellate court's comment that "[s]imply because [an immovable property] rule applies to states . . . does not mean it also applies to tribes."  (*Self, supra*, 60 Cal.App.5th at p. 216.)

[6]  But due to other circumstances in the case, the concurring justice agreed with the majority that the trial court's ruling dismissing the quiet title action was correct.  (*Self, supra*, 60 Cal.App.5th at p. 223 (conc. opn. of Reardon, J.) ["once a tribe petitions to

9

*Skagit*, which the concurring opinion "adopt[ed]." (*Id.* at pp. 222-223 (conc. opn. of Reardon, J.), italics added.)

The Committee argues that the circumstances that led the court in *Self* to conclude that the case before it was a " 'poor vehicle for extending the immovable property rule to tribes' " have "no parallel in the present dispute." Therefore, the Committee suggests, we are in a good position to recognize an immovable property exception to the doctrine of tribal sovereign immunity. We disagree.

First, the Committee's characterization of the reasoning in *Self* is incomplete. *Self* observed the case was a poor vehicle for creating an immovable property exception to tribal immunity after discussing multiple *independent* reasons why creating such an exception was inadvisable. The court noted (1) that neither dicta in high court case law nor federal legislation established the existence of an immovable property exception to the related common law doctrine of *foreign* sovereign immunity, (2) the appellate court saw no reason to depart from the high court's standard practice of deferring to Congress on tribal immunity, and (3) deference to Congress was also advisable given (a) Congress's history of selectively addressing tribal immunity issues in property disputes and (b) the importance of tribal land acquisition in federal policy. (*Self, supra*, 60 Cal.App.5th at pp. 218-221.) That same reasoning applies here.

Second, and more fundamentally, any suggestion in *Self* that a California intermediate appellate court *may properly* create an immovable property exception to tribal immunity in the context of a tribe's off-reservation contractual or commercial activity would be misleading, because as explained above, we are bound by the decisions of our Supreme Court that stand for the proposition that tribes are immune from suits in that context.

---

bring land within federal trust, [a] nuanced scheme created by Congress . . . preempts this litigation"].)

10

## II

*Suing Tribal Members in Their Official Capacities Does Not Change the Result*

The Committee argues that even if tribal sovereign immunity applies, this case could proceed with tribal leaders named in their official capacities as representatives of the tribe under principles articulated in *Ex parte Young* (1908) 209 U.S. 123. Nation disagrees, arguing *Ex parte Young* only authorizes prospective relief directed at ongoing unlawful conduct. We agree with Nation.

The *Ex parte Young* doctrine "permits actions for *prospective* non-monetary relief against state or tribal officials in their official capacity to enjoin them from violating federal law, without the presence of the immune State or tribe." (*Salt River Project Agric. Improvement & Power Dist. v. Lee* (9th Cir. 2012) 672 F.3d 1176, 1181, italics added; see *Vann v. United States Department of the Interior* (D.C. Cir. 2012) 701 F.3d 927, 929 [the *Ex parte Young* doctrine is based on the " 'fiction' " that when a court commands an official to " 'do nothing more than refrain from violating federal law, [the official] is not the State [or tribe] for sovereign-immunity purposes' "]; *Vann,* at p. 930 [a claim that an official "*is violating* federal law" presents a "typical *Ex parte Young* scenario" (italics added)].)

Here, the second and third causes of action in the Committee's complaint cannot be saved by the *Ex parte Young* doctrine because they allege violations of state law only. (*Doe v. Regents of the University of California* (9th Cir. 2018) 891 F.3d 1147, 1153 [*Ex parte Young* "does not apply when a suit seeks relief under state law"].) And while the first cause of action in the complaint does allege a violation of federal law, it does not purport to seek prospective relief for an *ongoing* violation of that law. (See *R.W. v. Columbia Basin College* (9th Cir. 2023) 77 F.4th 1214, 1221 ["under *Ex parte Young*, the plaintiff must allege . . . an ongoing violation of federal law for which she seeks

prospective injunctive relief"].)  Rather, it challenges the validity of Nation's *past* purchase of the airport.  Accordingly, the *Ex parte Young* doctrine is inapplicable here.[7]

III

*Indispensable Parties*

The trial court determined Nation was an indispensable party to the litigation because its "ownership interests" in the airport would potentially be affected by the Committee's lawsuit seeking to void the airport sale.  The Committee argues that determination was error under section 389 and led the trial court to improperly dismiss the action with prejudice.  We are not persuaded.

A.    *Legal Background*

1.    *Necessary and Indispensable Parties*

Section 389 governs the joinder of necessary and indispensable parties. Subdivision (a) of section 389 mandates joinder of a person "if (1) in his absence complete relief cannot be accorded among those already parties or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest."

Subdivision (b) of section 389 describes an indispensable party:  "If a person as described in paragraph (1) or (2) of subdivision (a) cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed without prejudice, the absent person being thus regarded as indispensable.  The factors to be considered by the court include:  (1) to

---

[7] Nation's request for judicial notice filed on December 13, 2023, is denied as unnecessary.

12

what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; (4) whether the plaintiff or cross-complainant will have an adequate remedy if the action is dismissed for nonjoinder."

"[A] person must be a necessary party to be an indispensable party." (*Verizon California Inc. v. Board of Equalization* (2014) 230 Cal.App.4th 666, 679.) We review the trial court's determination that a party is indispensable for abuse of discretion because the determination flows from an inquiry that implicates " 'fact-specific' considerations" and a " 'balancing of competing interests' " and calls for a pragmatic decision that is entrusted to a court's discretionary judgment that should not be second-guessed on appeal. (*County of San Joaquin v. State Water Resources Control Bd.* (1997) 54 Cal.App.4th 1144, 1152-1153.) In conducting this inquiry, a trial court has discretion " ' "in considering *which* factors to weigh and *how heavily* to emphasize certain considerations in deciding whether the action should go forward." ' " (*Id.* at p. 1152, italics added.)

### 2. *Appellant's Burden on Appeal*

"[I]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609.) To carry this burden, a party must "support claims of error with meaningful argument and citation to authority. [Citations.] When legal argument with citation to authority is not furnished on a particular point, we may treat the point as forfeited and pass it without consideration. . . . We are not required to examine undeveloped claims or to supply arguments for the litigants." (*Allen v. City of Sacramento* (2015) 234

13

Cal.App.4th 41, 52; see *Woods v. Horton* (2008) 167 Cal.App.4th 658, 677 ["A court need not consider an issue where reasoned, substantial argument and citation to supporting authorities are lacking"]; *Wright v. City of Los Angeles* (2001) 93 Cal.App.4th 683, 689 ["asserted grounds for appeal . . . that merely complain of error without presenting a coherent legal argument are deemed abandoned and unworthy of discussion"].)

B.     *Analysis*

The Committee's contention that Nation is not a *necessary* party to the lawsuit, comprising three sentences with no citation to authority, is forfeited on appeal. (*Allen v. City of Sacramento, supra*, 234 Cal.App.4th at p. 52.)

The Committee's contention the trial court erred in ruling Nation is an *indispensable* party to the lawsuit is unpersuasive because it rests on a misunderstanding of the law. Regarding the first factor in section 389, subdivision (b) ("to what extent a judgment rendered in the person's absence might be prejudicial to him"), the Committee argues Nation cannot be prejudiced by a judgment that awards the Committee the relief it seeks because "[i]f the sale was void *ab initio*," then Nation "will lose nothing by a judgment against it since it never had legal possession in the first place." That is incorrect. Section 389, subdivision (b)'s first factor is concerned with " 'interests' . . . not vested contract or property rights." (*County of Imperial v. Superior Court* (2007) 152 Cal.App.4th 13, 36.) And those interests are to be considered in relation to "the time relief is to be entered." (*Id.* at pp. 36-37.)

When the trial court decided the matter in 2023, Nation clearly had a cognizable interest in its 2018 purchase of the airport, even if Nation never had "legal possession," as the Committee contends. And the trial court may well have concluded that this first factor in the section 389, subdivision (b) analysis was dispositive. (See *County of San Joaquin v. State Water Resources Control Bd., supra*, 54 Cal.App.4th at p. 1152 [a trial court has discretion " ' "in considering which factors to weigh and how heavily to

14

emphasize certain considerations in deciding whether the action should go forward" ' "].) Thus, the Committee has not persuaded us that the trial court abused its discretion in determining that Nation was an indispensable party.  (*Jameson v. Desta, supra*, 5 Cal.5th at pp. 608-609; see *County of Imperial v. Superior Court, supra*, 152 Cal.App.4th at p. 35 [appellant analyzes each § 389, subd. (b) factor to "present a scenario in which the discretionary factors *could* be balanced" to permit a different result, "but . . . failed to demonstrate why the[ ] factors *must* be balanced in this manner"].)

## DISPOSITION

The judgment is affirmed.  Respondents are entitled to recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)


                                           _____/s/_____
                                           BOULWARE EURIE, J.


We concur:


_____/s/_____
DUARTE, Acting P. J.


_____/s/_____
RENNER, J.